John C. SHIMMAN, Plaintiff-Appellee,
Cross-Appellant,

v.

John FRANK et al., Defendants-Appellants, Cross-Appellees.

Nos. 77–3338 to 77–3343.

United States Court of Appeals,
Sixth Circuit.

Argued April 5, 1979.

Decided May 21, 1980.

Rehearing Denied Oct. 1, 1980.

C. Duane Callender, Neipp, Dorrell & Wingart, Toledo, Ohio, for Frank.

N. Victor Goodman, James F. DeLeone, Topper, Alloway, Goodman, DeLeone & Duffey, Stephen Lewis, Columbus, Ohio, for AFL-CIO.

Cary Rodman Cooper, Hayward, Cooper, Straub, Walinski, Cramer & Co., T. Scott Johnston, Toledo, Ohio, for plaintiff-appellee, cross-appellant.

Roy Daniel Chinnis, Wagoner, Steinberg, Chinnis & Smith, Holland, Ohio, for Grothaus.

Foster J. Fludine, Bertsch, Edelman & Fludine Co., Cleveland, Ohio, for Local No. 18.

Before ENGEL and KEITH, Circuit Judges and PECK, Senior Circuit Judge.

KEITH, Circuit Judge.

This case concerns an incident at a union meeting where a dissident union member was beaten. The victim of the beating sued a number of defendants, including the local union and the international union. The district court found every defendant liable and assessed damages totalling over $850,000. We find that all but one defendant is liable, but substantially reduce the damages award.

## FACTS

### BACKGROUND

Local 18 of the International Union of Operating Engineers includes virtually the entire state of Ohio and a small portion of the state of Kentucky. Local 18 has over 16,000 members who operate various types of construction equipment such as bulldozers and cranes. The local union is divided into six districts.

This case concerns events which occurred in District Two of Local 18. District two encompasses fifteen counties in northwest Ohio. Its headquarters is in Toledo. Since October of 1968, the appointed district representative who runs District Two has been John Frank.[1] Mr. Frank's leadership was strongly opposed by a group of dissidents led by four brothers—John, Ervin, Walter and William Shimman. Mr. Frank was not the first union official opposed by the dissidents. The Shimmans were long-time union members who had a history of opposing the incumbent leadership. The dissidents claimed that the local union leaders behaved dictatorially. They thought that the membership needed protection from arbitrary behavior by union leaders, particularly district representatives.[2]

The dissidents tangled often with the established leadership. In 1959, John Shimman filed suit under § 101 of the then recently passed Landrum-Griffin Act.[3] He claimed that the local union had arbitrarily

---

1. Mr. Frank is also Vice-President of Local 18, an elected office.

2. In his brief, John Shimman advances the following as key dissident causes: 1) an open and fair job referral system, 2) a voice in the selection of district representatives, 3) open access to names and addresses of union members, 4) a non-discriminatory intra-union election ballot, and 5) democratically conducted meetings.

 The district court characterized District Two union democracy under John Frank as "a system where one man runs things and all the others support him."

3. The Act is also called the Labor-Management Reporting and Disclosure Act (LMRDA). § 101 of this Act, 29 U.S.C. § 411 provides:

 **§ 411. Bill of rights; constitution and bylaws of labor organizations**

 **(a)(1) Equal rights.**—Every member of a labor organization shall have equal rights and privileges within such labor organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

refused to hold union meetings and that the local union leadership was conducting union affairs without regard for the wishes of the membership. After the suit was filed, the union resumed conducting open meetings. The case was eventually dismissed as moot.

Throughout the 1960's and early 1970's, various dissidents ran for union office. At different times, John, Walter and Ervin Shimman ran for and served on the Executive Board of Local 18.[4] Dissidents enjoyed some success in elections where only Dis-

(2) **Freedom of speech and assembly.**—Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

(3) **Dues, initiation fees, and assessments.**—Except in the case of a federation of national or international labor organizations, the rates of dues and initiation fees payable by members of any labor organization in effect on September 14, 1959 shall not be increased, and no general or special assessment shall be levied upon such members, except—

(A) in the case of a local labor organization, (i) by majority vote by secret ballot of the members in good standing voting at a general or special membership meeting, after reasonable notice of the intention to vote upon such question, or (ii) by majority vote of the members in good standing voting in a membership referendum conducted by secret ballot; or

(B) in the case of a labor organization, other than a local labor organization or a federation of national or international labor organizations, (i) by majority vote of the delegates voting at a regular convention, or at a special convention of such labor organization held upon not less than thirty days' written notice to the principal office of each local or constituent labor organization entitled to such notice, or (ii) by majority vote of the members in good standing of such labor organization voting in a membership referendum conducted by secret ballot, or (iii) by majority vote of the members of the executive board or similar governing body of such labor organization, pursuant to express authority contained in the constitution and bylaws of such labor organization: *Provided,* That such action on the part of the executive board or similar governing body shall be ef-

fective only until the next regular convention of such labor organization.

(4) **Protection of the right to sue.**—No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator: *Provided,* That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof: *And provided further,* That no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance, or petition.

(5) **Safeguards against improper disciplinary action.**—No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

(b) Any provision of the constitution and bylaws of any labor organization which is inconsistent with the provisions of this section shall be of no force or effect.

§ 102 of the Act, 29 U.S.C. § 412 allows aggrieved persons to file suits if their rights are violated:

**Civil action for infringement of rights; jurisdiction**

Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate. Any such action against a labor organization shall be brought in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located.

4. The Local Executive Board has residual governing authority over Local 18. The Executive

trict Two members voted. Dissidents enjoyed no success in state-wide elections where all of Local 18's membership voted. The reason for this was that most dissident activities were centered in District Two, where the Shimmans lived and had support. Not surprisingly, the dissidents' chief antagonist was the man who was in charge of District Two, John Frank. Frank presided at district union meetings, oversaw the union's job referral system and otherwise conducted local union business at the district level. Frank's formal title was district representative. He was appointed, not elected.

Statewide, Local 18's chief executive officer is the Business Manager. The business manager's job is to direct and conduct all of the business of Local 18.[5] Among other duties, the Business Manager appoints district representatives like John Frank.[6] John Possehl is the Business Manager of Local 18. He, more than anyone else, ran Local 18.

In the 1971 local union election, William Shimman ran against John Possehl for the position of Business Manager. Dissident Glenn Oberle ran against John Frank for Vice-President. Both lost the election on a statewide basis, but did very well within District Two.

Union elections were also held in the summer of 1972. Again, dissident Glenn Oberle ran against John Frank for Vice-President. Again Oberle lost, although he gained more votes than Frank did within district two. William Shimman also ran against John Possehl for Business Manager, but again lost. However, Walter Shimman

and fellow dissident Raymond Rojek were elected to serve as two of the District's three representatives on Local 18's executive board.[7] James Grothaus, a supporter of John Frank, was defeated.

The above background facts are undisputed. Most of the facts surrounding the event which led to this suit are also undisputed. District Representative John Frank was conducting a regularly scheduled District Two union meeting in Toledo, Ohio on September 11, 1972. Dissident union member Ervin Shimman was sitting in his seat taking notes. James Grothaus, a union member who supported the incumbent leadership, reached over Ervin Shimman's shoulder and snatched the notes. Grothaus darted away to his seat with the notes. Just as Grothaus was sitting down, John Shimman, Ervin's brother, reached over Grothaus' shoulder in an effort to retrieve the notes. Grothaus turned and knocked John Shimman to the ground. John Shimman was then surrounded by bystanders. Terry Grothaus, the son of James Grothaus, kicked John Shimman in the head several times before being pulled away.

John Shimman then filed the instant suit. He claimed that the beating he received was administered because of his dissident activities. He asserted that the beating violated his rights under § 101 of the Landrum-Griffin Act.[8] In addition, he added a pendant claim under Ohio state law for assault and battery and a claim alleging a violation of 42 U.S.C. § 1985(3) and § 1986 because of a conspiracy to violate his civil rights.[9] The district court dismissed the

---

Board can overrule actions taken by the Business Manager, who runs day to day union affairs. The Board is composed of the Local's chief elected officers-Business Manager, President, Vice-President, Treasurer, Recording Correspondence Secretary, Financial Secretary, as well as three members elected from each of the six districts into which Local 18 is divided. Bylaws of Local 18, Art. XV.

5. Bylaws of Local 18, XVI, following, Constitution, International Union of Operating Engineers, Art. XXIII(i)(a).

6. *Id.*

7. *See* n. 4 *supra.* The third member selected to represent District Two on the executive board was Kenneth Delaney. Delaney was not a dissident.

8. *See* n. 3, *supra.*

9. 42 U.S.C. § 1985(3) provides:
Third. If two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering

civil rights claim, but upheld liability under the Landrum-Griffin and assault and battery claim.[10]

## The District Court's Findings of Fact and Conclusions of Law

The district court ruled for the plaintiff in all significant respects. The court concluded that the beating had the purpose and effect of intimidating the dissidents. The court held that the beating had the obvious result of infringing on plaintiff John Shimman's rights, protected under § 101 of the Landrum-Griffin Act. Further, the court concluded that the beating constituted an assault and battery under state law.

The court found that James and Terry Grothaus were active participants in the beating. They were assessed $75,000 ·and $25,000 punitive damages respectively. The court also found that John Frank had instigated and conspired to arrange the beating. He was assessed $75,000 in punitive damages. The court further found that Local 18 Business Manager John Possehl had sent Frank to suppress the dissidents. Accordingly, the court found Local 18 vicariously liable and assessed punitive damages at $250,000. On an identical theory, the court found the International Union liable and assessed $250,000 punitive damages against it. In addition, all defendants were held jointly and severally liable for $107,067.99 compensatory damages and $75,000 attorneys' fees.

The court's key findings regarding the beating were as follows:

the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice-President, or as a member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1986 provides:

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in the preceding section [42 U.S.C. § 1985], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by

any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued.

10. We note that the various causes of action alleged by plaintiff are coextensive. That is, the rights protected under the Landrum-Griffin Act, the Civil Rights Act and Ohio tort law are, in this case, one and the same. The reason is that liability is predicated on the beating John Shimman received. Depending on the motivation for the beating, it could constitute a violation of the Landrum-Griffin Act or the Civil Rights Act as well as being a common-law tort. However, for purposes of damages, it makes no difference on what theory liability is based. The beating is the basis for the damages award under all theories. *See U.M.W. v. Gibbs*, 383 U.S. 715, 721–29, 86 S.Ct. 1130, 1136, 1140, 16 L.Ed.2d 218 (1966).

Because of this, we need not reach the issue raised in plaintiff's cross-appeal of the district court's determination that he could not maintain an action under 42 U.S.C. § 1983(3) and § 1986. Even if the plaintiff could also bring suit under these Civil Rights statutes, his recovery would not be affected. *Compare Morrissey v. National Maritime Union of America*, 397 F.Supp. 659, 666 (S.D.N.Y.1975), *affirmed in part, reversed in part*, 544 F.2d 19 (2d Cir. 1976) (jury could properly award separate damages for violation of the Landrum-Griffin Act and common-law-malicious prosecution).

Although there was much evidence that the defendant John Frank had used his powers as business manager to keep himself in office by punishing those opposed to him, apparently the defeat of James Grothaus and the election of Raymond Rojek and Walter Shimman in 197[2] was more than usually galling to him. The evidence establishes quite clearly that this was because he had been appointed Business Manager of District 2 for the purpose of ending the division among the membership by eliminating the leaders of the dissidents, and was failing to do so. Some of the dissidents had scored against the defendant Frank and Local 18 before the National Labor Relations Board, and against James Grothaus in an assault and battery case.

The evidence establishes beyond any doubt that at a meeting early in September, 1972, the defendant Frank stated that Raymond Rojek needed a fist in his mouth, but that the blood should flow in the streets and not in the Union Hall. Thus the stage was set for the events which occurred at the general membership meeting of District 2 that was held on September 11, 1972.

Most of the evidence at the trial was concerned with the events of the September 11, 1972 meeting. While the evidence was not without conflict as to details, those conflicts were of the kind which always occur when a number of different witnesses are describing the same occurrence. Absence of such conflicts normally indicates a fabricated story.

The principal actors in the meeting that night were the plaintiff, his brother, Ervin, and the individual defendants John Frank, James Grothaus, and his son, Terry Grothaus. The presence of the two Grothauses strengthens the conclusion that drastic means were to be resorted to in order to break the growing power of the dissident members. Neither of them had been working as an operating engineer for a long time. James Grothaus had gone into business for himself the previous December. (He was still so engaged at the time of trial, and had not worked as an operating engineer since December, 1971.) Terry Grothaus had been severely wounded while a member of the United States Marine Corps in Viet Nam. As a consequence, he was on sick leave from his employment as a factory worker at Champion Spark Plug, where he had been employed since August, 1971. His last work as an operating engineer had been for a brief period shortly after his discharge from the military. He had never attended a Union meeting until the previous meeting on September 5, 1972.

The defendant Frank was in charge of the meeting, and set the tone by reporting the election results and denouncing in scatological terms the two members who had defeated candidates he favored. There were other indications that something out of the ordinary was going to happen, for the seating of those attending was unusual. The normal seating arrangements find the members of the dissident group sitting on the east side of the hall, with the organization leadership sitting on the west side. On September 11, the two Grothauses and some of their friends, including two who rarely, if ever, attended meetings, seated themselves on the east side of the hall, in proximity to the plaintiff and his brother Ervin.

The meeting was well along toward its close, and Ervin Shimman, who was located in his usual place, beside the drinking fountain was addressing the chair when James Grothaus came up behind him, stamped his feet, and shouted. Shimman, naturally, was startled. James Grothaus, with mock solicitude, said "Did I scare you, Erv? I was only going for a drink of water." Instead of rebuking Grothaus for the interruption, the defendant Frank, in unbelievably crude and vulgar language, referred to Ervin Shimman's being startled. The episode provoked laughter, and Shimman took his seat.

Ervin Shimman was taking notes in a small notebook, which he was accustomed to do. Although the Union had no rule forbidding this, and James Grothaus was well aware of that fact, he was accus-

tomed to threaten note-takers that he would take their notes from them. He did this at the September 5, 1972 meeting, and was told that he had no right to do so. Nevertheless, on this occasion, after he had gotten his drink, and was returning rapidly to his seat, he reached over Ervin Shimman's shoulder and snatched his notebook, continuing with unbroken pace to his seat.

The plaintiff had been seated behind James Grothaus. Terry Grothaus was seated in the chair next to his father, James Grothaus. As James Grothaus was resuming his seat, the plaintiff attempted to reach over his shoulder and recover his brother's notebook. James Grothaus arose and made a complete turn around to his left, in the process striking plaintiff in the chest or stomach with his arm. The plaintiff doubled up and fell or was thrown against Terry Grothaus. Terry Grothaus pushed plaintiff to the floor, and kicked him several times in the head as plaintiff lay prone, attempting to cover his head with his hands.

The whole episode occurred very quickly, as if it had been well planned. People sitting nearby pulled Terry Grothaus away, and James Grothaus told him to get out, which he did immediately. James Grothaus turned the stolen notebook over to one of his friends, who afterwards destroyed it. The police and an ambulance were called, and plaintiff was taken to the hospital.

Thereafter, Ray Rojek resigned from his office. The plaintiff has not attended any more union meetings, nor has Glenn Oberle, who had run against the defendant Frank in the 1972 election.

On appeal, the defendants have challenged every finding of fact and conclusion of law made by the district court.[11] We will examine their claims *seriatim*.

## I. COLLATERAL ESTOPPEL

The beating at the Union Hall on September 11, 1972, was also the subject of federal criminal proceedings. John Frank, Terry Grothaus and James Grothaus were charged with violating John Shimman's rights under 29 U.S.C. § 530,[12] the criminal

---

11. The facts of this case could be turned into a movie. To aid in distinguishing the cast of characters and their roles, we set forth the following outline:

Dissidents

John Shimman: plaintiff, dissident beaten up on September 11, 1972.

Ervin Shimman: dissident, had notebook taken out of his hand on September 11, 1972.

Walter Shimman: dissident, NLRB found that he had been retaliated against because of his dissident activities.

William Shimman: dissident, ran against John Possehl for Business Manager of the local union in 1972.

Glenn "Bud" Oberle: dissident, NLRB found that he had been retaliated against because of his dissident activities. Ran against John Frank in 1972 for the position of Vice-President of Local 18.

Raymond Rojek: dissident, successfully ran for State Executive Board, defeating James Grothaus.

Incumbents

International Union of Operating Engineers (The International)

International Union of Operating Engineers, Local 18 (The Local) serves almost the entire state of Ohio.

John Possehl: Business Manager of Local 18. Also, vice-president of the International Union.

John Frank: Appointed by Possehl in 1968 to be district representative to District 2 of the Local. Also elected Vice-President of Local 18; participated in events leading to the beating of John Shimman.

James Grothaus: Anti-dissident; participated in events leading to the beating of John Shimman.

Terry Grothaus: son of James Grothaus; participated in events leading to the beating of John Shimman.

12. This statute reads as follows:

**§ 530. Deprivation of rights by violence; penalty**

It shall be unlawful for any person through the use of force or violence, or threat of the use of force or violence, to restrain, coerce, or intimidate, or attempt to restrain, coerce, or intimidate any member of a labor organization for the purpose of interfering with or preventing the exercise of any right to which he is entitled under the provisions of this chapter. Any person who willfully violates this section shall be fined not more than $1,000 or imprisoned for not more than one year, or both.

counterpart to 29 U.S.C. § 412. Since both sides waived a jury trial, the cases came to trial before the court.[13] The court severed the case against John Frank. At the conclusion of the government's case against Terry and James Grothaus, the court dismissed the charges, concluding that no violation of § 530 had taken place. The government subsequently dropped criminal charges against John Frank.

The demise of criminal proceedings resulting from the September 11, 1972 beating has carried over to this case, which is a civil counterpart to the government action. The reason is that defendants argue that collateral estoppel should apply to bar John Shimman's civil suit. Defendants particularly point out that the district judge handling the criminal case stated in open court as he dismissed the action against the Grothaus' that:

"... . there is not one bit of evidence that any threats were used or any force or violence was used to keep Mr. John Shimman from attending a membership meeting, from expressing any views, arguments, or opinions, or expressing his views upon any business properly before the meeting. . . . This is merely an assault and battery case over which this court has no jurisdiction."

■ We cannot agree with the defendants' claims. Collateral estoppel and res judicata are judicially established doctrines which bar litigating issues which have been litigated once already. The doctrines are based on an overall fairness rationale and are not to be "rigidly applied." *Tipler v. E. duPont de Nemours and Co.*, 443 F.2d 125, 128 (6th Cir. 1971). *See Montana v. United States*, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *United States v. La Fatch*, 565 F.2d 81 (6th Cir. 1977), *cert. denied*, 435 U.S. 971, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978). Under established law, collateral estoppel cannot be applied here.

■ It has been long established that an acquittal in a criminal prosecution does not bar a subsequent civil suit. There are several reasons for this. The principal reason is that the burden of proof in a criminal proceeding is far higher than that in a civil proceeding—beyond a reasonable doubt as opposed to a preponderance of the evidence. Thus, the dismissal of criminal charges cannot operate to collaterally estop a civil proceeding. *Helvering v. Mitchell*, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938) *distinguishing Coffey v. United States*, 116 U.S. 427, 6 S.Ct. 432, 29 L.Ed. 681 (1886). *See One Lot Emerald Cut Stones v. United States*, 409 U.S. 232, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972); *United States v. National Association of Real Estate Boards*, 339 U.S. 485, 70 S.Ct. 711, 94 L.Ed. 1007 (1950); *Stone v. United States*, 167 U.S. 178, 17 S.Ct. 778, 42 L.Ed. 127 (1897); *United States v. Burkhart*, 501 F.2d 993 (6th Cir. 1974), *cert. denied*, 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975).

■ Second, in this case, different parties are involved in the respective proceedings. In the criminal proceeding, the plaintiff was the United States. In this civil proceeding, the plaintiff is John C. Shimman. It has also long been the law that the doctrine of collateral estoppel only applies against a party to the first action. *Blonder-Tongue v. Univ. of Ill. Foundation*, 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788 (1971); *Humphreys v. Tann*, 487 F.2d 666 (6th Cir. 1973), *cert. denied*, 416 U.S. 956, 94 S.Ct. 1970, 40 L.Ed.2d 307 (1974). The Supreme Court's recent decision in *Park Lane Hosiery v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) does not change this fundamental rule. *Park Lane Hosiery* holds that where it would be fair to do so, a different plaintiff may apply collateral estoppel against a defendant who has lost a previous suit involving the same issues. However, in this case, as in *Humphreys v. Tann, supra*, defendants are trying to apply collateral estoppel against a non-party to the first action. It would be unfair to bar the claim of a civil litigant

---

**13.** The judge who tried the criminal case was a different judge from the one who tried the civil case which is the subject of this appeal.

simply because the government lost a related criminal case against the same defendant.

Defendants' emphasis on the statements made in open court by the judge at the criminal trial is misplaced. The judge found "not one bit of evidence" that John Shimman's § 101 free speech and assembly rights were violated. However, the court also stated its concern that a federal crime was being charged.[14] We also note that the evidence presented at the criminal trial was spartan compared with that presented in the civil case before us.[15] We finally note that double jeopardy principles prevented the government from appealing the adverse verdict in the criminal proceeding. There was no way to get appellate review of the judge's decision. The facts of this case thus illustrate the reasonableness of established authority which makes collateral estoppel inapplicable here.

## II.

### Liability of the Individual Defendants under the Landrum-Griffin Act

#### A. General Considerations

On appeal, the defendants have attacked the district court's findings of fact as unsupported by the record. Defendants admit that John Shimman was beaten at the September 11, 1972 union meeting, but claim that the beating was an isolated, spontaneous incident of short duration. Defendants argue that neither John Shimman, his brothers, nor any of the dissidents has ever been refused the right to attend or speak at union meetings or to exercise any "union democracy" right conferred by § 101.

The record does contain much evidence that John Shimman and his fellow dissidents were never prevented from attending union meetings, from voting in union elections, or from openly exercising their free speech rights. Indeed, John Shimman testified directly that this was so.

The defendants did not forcibly eject the dissidents from union meetings. Nor did the defendants physically prevent the dissidents from speaking out, nominating candidates or otherwise participating in union business. Defendants couple these facts with the argument that the beating of John Shimman was a spontaneous, unpredictable occurrence to reach the conclusion that no § 101 violation took place.

There is evidence in the record supporting defendants' argument. The fact that the dissidents have long existed and remained active in the union indicates that they were vigorously exercising their rights. Further, to many if not most of the 80 or so union members who attended the meeting on September 11, 1972, the scuffle between John Shimman and James and Terry Grothaus did appear to be spontaneous and unexpected.

Unfortunately for the defendants, the district court did not agree with their theory of the beating. The court thought that the September 1972 incident was far more than a simple altercation between union members. The court concluded that the beating of John Shimman was part of a scheme directed by John Frank to intimidate the dissidents and cower them into silence.

 We do not doubt that a deliberate attack on a union member can amount to a violation of § 101. In fact, there are few more direct ways of chilling the exercise of a union member's Landrum-Griffin Act rights than by beating him up.[16] The real

---

14. The district court's commendable caution is shown by the following statements:

 This section of the code [§ 530] is a federal crime, and even though the Government's view, as is probably proper, that there are good guys and there are bad guys in this organization, I think that is probably true in any labor organization. And I think the effort the Government expended in trying to get into Local 18 of the International Union of Operating Engineers has been well spent and made clear the air and may make more free and open the functions of the union. But this, nevertheless is a criminal statute.

15. A complete transcript of the criminal trial was introduced as an exhibit below.

16. Most of the reported cases brought under § 101 have concerned abusive use of union disciplinary machinery. *See e. g., Rosario v.*

issue here is whether the record supports the district court's determination that the beating was deliberately administered in order to teach the dissidents a lesson. An isolated fight between two union members has nothing to do with the Landrum-Griffin Act. A beating designed to punish dissidents violates the Act.

■ Of course, under F.R.Civ.Pro. 52, we cannot substitute our judgment for that of the district court. We can only reverse findings of fact if we are convinced that they are clearly erroneous.

## B. Liability of John Frank and James and Terry Grothaus

■ The district court's conclusion that John Frank, James Grothaus and Terry Grothaus conspired to intimidate the dissidents is not clearly erroneous. Nor can we overturn the court's conclusion that the beating of John Shimman was at the very least a foreseeable result of events which Frank and the Grothauses deliberately set in motion.

It is not disputed that John Shimman and his brothers were the leaders of a long established group of dissidents in District Two. The hostile relationship between the dissidents and the entrenched leadership, that of John Frank, is a matter of record.

In January of 1972, dissident Walter Shimman filed unfair labor practice charges with the National Labor Relations Board against Local 18. He charged that the local had discriminated against him in job referrals and had threatened him and fellow dissidents with reprisals because of the dissidents' opposition to the established leadership. Dissident Glenn Oberle filed similar charges in April of 1972. The charges were consolidated and a hearing was held before an NLRB Administrative Law Judge in July of 1972. In an exhaustive opinion, the ALJ found that John Frank threatened to retaliate against the dissidents on numerous occasions in 1971 because of their anti-incumbent activities. He also found that Frank carried out his threats by denying Walter Shimman and Glenn Oberle job referrals to which they were entitled. The NLRB adopted the ALJ's findings and this court enforced the Board's order. *International Union of Operating Engineers, Local 18, AFL–CIO*, 205 NLRB 146 (1973), *enforced*, 500 F.2d 48 (6th Cir. 1974).

Much of the testimony which was presented to the ALJ was repeated in the trial below. This testimony supports the NLRB's finding that John Frank discriminatorily refused to permit dissidents Walter Shimman and Glenn Oberle to work because they ran for union offices in opposition to the incumbent leadership in 1971 and engaged in other intra-union political activities.

*Amalgamated Ladies Garment Cutters Union, Local 10 ILGWU*, 605 F.2d 1228 (2d Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 1853, 64 L.Ed.2d 273 (1980); *Feltington v. Moving Picture Machine Operators*, 605 F.2d 1251 (2d Cir. 1979). Formal expulsion of a member for exercising his free speech rights is the "classic" example of a § 101 violation. *Giordani v. Upholsterers Int'l Union of No. America*, 403 F.2d 85 (2d Cir. 1968); *Farowitz v. Assoc. Musicians of Greater New York*, 330 F.2d 999 (2d Cir. 1964). Other examples are discriminatory job referrals, *Vandeventer v. Local Union No. 513 of the Int'l Union of Operating Engineers*, 579 F.2d 1373 (8th Cir. 1978); *Newman v. Local 1101, Communications Workers*, 570 F.2d 439 (2d Cir. 1978), *opinion after remand*, 597 F.2d 833 (1979); *Keene v. Int'l Union of Operating Eng.*, 569 F.2d 1375 (5th Cir. 1978), and discriminatory intra-union job dismissal or transfer. *Cooke v. Orange Belt Dist. Council of Painters*, 529 F.2d 815 (9th Cir. 1976); *Wood v.*

*Dennis*, 489 F.2d 849 (7th Cir. 1973), *cert. denied*, 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974). *But see Newman v. Local 1101, Communications Workers of America, AFL–CIO*, 570 F.2d 439 (2d Cir. 1978); *Wambles v. Int'l Bro. of Teamsters*, 488 F.2d 888 (5th Cir. 1974); *Sheridan v. United Bro. of Carpenters*, 306 F.2d 152 (3d Cir. 1962). *See generally* Beaird & Player, *Free Speech and the Landrum-Griffin Act*, 25 Ala.L.Rev. 577 (1973).

A beating designed to intimidate union members, however, can also violate § 101. Judge Lively's words in *Kuebler v. Cleveland Lithographers & Photo. U. Loc. 24–P*, 473 F.2d 359, 364 (6th Cir. 1973) are applicable here:

> It was a concern for greater democracy within unions which originally prompted Congress to enact [the Bill of Rights Provisions of the Landrum-Griffin Act] . . . [N]o democracy can flourish where freedom of speech and assembly are hindered by threats of reprisal. . . .

The antagonism between John Frank and the dissidents cannot be questioned. In the words of one witness, the dissidents were a thorn in John Frank's side. The district court found that when threats and job reprisals did not succeed in intimidating the dissidents, that Frank turned to violence.

We find extensive evidence in the record to support this finding. Former union member Barney McCoy testified that John Frank asked him to be one of "a half-dozen good men to straighten some of these people out"—"people like Jack [John] Shimman, Bill [William] Shimman and Bud [Glenn] Oberle." McCoy had no doubt what John Frank meant:

> The substance was that he wanted whatever it took to get them out of the hall. Now, when you talk to this man when he makes a statement of that nature you know what it takes. The word murder wasn't in there, but you had a good idea "whatever it took" means.

McCoy testified that Frank promised that "everything will be taken care of," including attorneys' fees should any of the men be caught. Frank mentioned two other "good men" to McCoy in the conversation: Kenneth Delaney and James Grothaus. Mr. Delaney was held in contempt of court for refusing to testify in the trial below. James Grothaus was one of the men who struck John Shimman on September 11, 1972.

In July of 1972, testimony was being taken before the NLRB's Administrative Law Judge on Glenn Oberle's and Walter Shimman's charges of discriminatory job referrals. At a union meeting during this time, John Frank verbally attacked Glenn Oberle

for going to the NLRB. Ken Delaney and James Grothaus joined Frank in ridiculing dissident Oberle.

The dissidents usually took notes at union meetings. John Frank was strongly opposed to this practice. He ran the meetings and much of what he said was being taken down. During the NLRB hearing in July of 1972, dissident notes proved useful in refreshing the dissidents' recollections. With the help of the notes, the dissidents were able to testify with precision regarding John Frank's conduct. At an August, 1972 Advisory Board [17] meeting of District Two, the note-taking issue was brought up. This was the first such meeting since the NLRB hearings. Two dissidents testified at trial that James Grothaus stated at the advisory board meeting that no one taking notes was going to leave the meeting with the notes. John Frank stated that the dissidents were permitted to take notes, but that disciplinary proceedings might be invoked.[18]

In August of 1972, union election results concerning the 1972 elections were published. As previously mentioned, the dissidents had fielded many candidates for a variety of union offices. William Shimman had run against John Possehl for Business Manager of Local 18. Glenn Oberle had run against John Frank for Vice-President of Local 18. These were "statewide" officers, voted on by the full membership of the local. In addition, the dissidents ran for offices within the district. Dissidents Ray Rojek and Walter Shimman ran for the position of district representative to the local's execu-

---

17. The function of the district advisory board is not clear from the record but it appears to be very limited. The board is composed of elected union members representing a broad variety of work interests. Local 18 Bylaws Art. XXIV Sec. 1. The advisory board's role is akin to that of the district membership meeting—to make recommendations to the Local, discuss matters of general interest and to preliminarily inquire into misconduct charges filed against a union member. Local 18 Bylaws, Arts. XX, XXV.

18. There is evidence that the notes were a sore point with the incumbent leadership. Ervin Shimman testified that at a May, 1972 advisory board meeting, James Grothaus threatened him, saying "You little cheap m_____ someday I'm going to get those notes from you." Ervin Shimman also testified that at a regular union meeting in the summer of 1972, John Frank threatened him about his notetaking. John Frank denied that he was concerned about dissident notetaking. However, the district court concluded otherwise and there is substantial evidence in the record supporting its finding.

tive board.[19] In addition, Walter Shimman ran for a seat on the district advisory board.[20]

The dissidents did not succeed in the statewide elections for union office, but made a good showing within District Two. In fact, Glenn Oberle collected more votes within the district than John Frank did for the Vice-President's spot. Moreover, the dissidents were very successful in the district level elections. Ray Rojek and Walter Shimman were elected as district representatives to the local's executive board. James Grothaus, who also ran for that office, was defeated.

On September 5, 1972, another district advisory board meeting took place. This was the first union meeting of any kind since the election results had been announced. John Frank presided at this meeting. He was not pleased with the dissidents' partial election successes. The district court credited testimony that John Frank stated at the meeting that dissident Ray Rojek needed a fist in his mouth, and that blood should flow in the streets, although not in the union hall. In addition, there was testimony that James Grothaus sat between dissidents Walter Shimman and Ray Rojek at the meeting and engaged in a tug of war with Mr. Rojek over the latter's briefcase. The district court reasonably found that the words and conduct of both Mr. Frank and Mr. Grothaus were threatening.

The regular membership meeting of District 2 took place on September 11, 1972. This was the meeting at which John Shimman was beaten. Since the meeting was attended by over 80 union members, there is extensive testimony in the record as to what occurred. There are, of course, many minor variances in the testimony. The district court's view of the testimony, reproduced above, is a fair and reasonable account of what happened.

Upon review of the record, we are convinced that the district court could have credited dissident testimony that the seating arrangement at the meeting was unusual in that Frank's supporters were seated in areas normally occupied by dissidents. The court could have reasonably inferred that Frank's verbal attacks on the dissidents during the meeting and his refusal to keep the meeting under control was part of a scheme to physically attack one of the dissidents. The court could have also inferred the existence of a conspiracy from Frank's open approval of James Grothaus' conduct when Grothaus threateningly rushed Ervin Shimman prior to getting a drink of water and stealing Shimman's notebook.

There is additional evidence from which the court could have inferred that the beating of John Shimman was not spontaneous. James Grothaus was self-employed. He had not worked as an operating engineer since December, 1971. His son, Terry Grothaus, worked for the Champion Spark Plug Company and had not worked as an operating engineer since 1970. Two friends of James Grothaus, Gary Agler and Albert Dawes were unknown to anyone else. The only union meetings ever attended by Terry Grothaus, Agler, or Dawes were the September 5, 1972, advisory board meeting where the dissidents were threatened and the September 11, 1972, general meeting where John Shimman was beaten up. The district court was not bound to accept Terry Grothaus, Agler's and Dawes' conflicting explanations as to why they picked those particular meetings to attend. Nor was the district court bound to accept James Grothaus' testimony that he never actually struck John Shimman, or Terry Grothaus' testimony, that he kicked John Shimman on the floor because Shimman had struck him while trying to retrieve the notes.[21] We note that James Grothaus and Terry Grothaus weighed over 220 pounds each. John and Ervin Shimman were estimated to weigh about 170 pounds each.

---

19. See n. 4, *supra.*

20. See n. 17, *supra.*

21. The Grothaus's self-serving testimony was contradicted by virtually every other witness.

We reiterate that the incident in question here was not a spat among old friends. It was the culmination of years of antagonism. For example, there was testimony that John Frank continually threatened and verbally abused the dissidents.[22] The evidence outlined above supports the district court's conclusion that the defendants resorted to violence after their other efforts to silence the dissidents had failed.[23]

As the district court noted, most of the facts in this case were not disputed. It is true that the defendants disclaimed liability and denied making some of the more egregious statements attributed to them. However, their credibility was for the fact-finder to determine. Ultimately, this case hinges on the reasonableness of the inferences drawn by the district court. Upon careful review of the record, we find the court's inferences reasonable and well-supported. John Shimman was beaten by thugs acting at the direction of John Frank because of Shimman's dissident activities.[24]

## III. LIABILITY OF THE DEFENDANT UNIONS

The district court found the International Union of Operating Engineers and the local union, Local 18, liable for the assault on John Shimman. The court premised liability against both the local and the international on two theories: (1) express authorization; 2) carelessness in the selection of agents.

Specifically, the court found culpability because of the conduct of John Possehl, who was a Vice-President of the International Union and also Business Manager of the local. The court found that Possehl was warned of Frank's threats and conduct, but failed to remove Frank or otherwise eliminate problems between him and the dissidents. In addition, the court stated that it had "no doubt that both Local 18 and the International Union had determined that it would be necessary to use physical violence to beat the members of District Two into submission, and the named individual defendants [Frank, James Grothaus, Terry Grothaus] were the agents selected for the purpose." The district court's explanation of why the local and international unions should be liable is not very helpful. Instead of remanding for more specific analysis, however, we have carefully examined the record.

■ Unions, like corporations or other artificial entities, can act only through their agents. Under general principles of agency, a union can be liable if its officers and agents actively participate in unlawful conduct. *Morrissey v. National Maritime Unions of America*, 544 F.2d 19, 25 (2d Cir. 1976) (Landrum-Griffin Act); *Riverside Coal Co. v. U.M.W.*, 410 F.2d 267, 270–72 (6th Cir.), *cert. denied*, 396 U.S. 846, 90 S.Ct. 89, 24 L.Ed.2d 95 (1969) (Taft-Hartley Act). Most such situations arise in the case of an

22. There was testimony that John Frank routinely made verbal attacks on the dissidents at union meetings. Ervin Shimman testified that John Frank told him on several occasions that he (Frank) was giving to starve him and the other dissidents out. Similarly, there was testimony that Frank often stated that he was going to "get" the dissidents.

23. Under long-established principles of tort law, the defendants' conduct also constituted an assault and battery under Ohio law. The district court properly found liability under this theory.

24. As the district court noted, John Shimman was clearly not a designated target to be beaten. The defendants had no way of knowing that John Shimman would immediately respond as he did to the seizure of his brother's notes. Rather, James Grothaus's rushing at Ervin Shimman and subsequent theft of his notes was itself an intimidatory practice. Grothaus was seeking to intimidate the dissidents and set up a confrontation with them. As indicated, the district court concluded that Grothaus had planned for violence that night. We cannot overturn this inference. Even if we could, the record clearly shows that violence was a logical result of the confrontation. Similarly, even if John Frank had no specific advance knowledge of what James Grothaus was going to do at the meeting, there is ample evidence to support a finding of liability. Much evidence supports the inference that Frank instigated and supported Grothaus in his anti-dissident "campaign." Even if Grothaus went a bit further than Frank anticipated, Frank is still liable.

illegal strike. Whether the union is liable for damages resulting from an illegal strike depends on the conduct of its officials in differing fact situations. *See Koehring Co. v. United Steelworkers,* 616 F.2d 919 (6th Cir. 1980); *Buckeye Power, Inc. v. Utility Workers Union of America,* 607 F.2d 695 (6th Cir. 1979); *Southern Ohio Coal Co. v. U. M. W.,* 551 F.2d 695 (6th Cir.), *cert. denied,* 434 U.S. 876, 98 S.Ct. 227, 54 L.Ed.2d 155; *Riverton Coal Co. v. U.M.W.,* 453 F.2d 1035 (6th Cir.), *cert. denied,* 407 U.S. 915, 92 S.Ct. .2439, 32 L.Ed.2d 690 (1972).

 The rule of law remains, however, that a union "may only be held responsible for the authorized or ratified actions of its officers and agents." *North American Coal Co. v. U.M.W.,* 497 F.2d 459, 466–67 (6th Cir. 1974) (citing cases).

 This same rule of law applies in situations where both a local and an international union are sued. The fact that an officer of the local union may have transgressed does not mean that the International is liable.[25] The Supreme Court first outlined this principle in *United Mine Workers of America v. Coronado Coal Co.,* 259 U.S.

344, 395, 42 S.Ct. 570, 577–578, 66 L.Ed. 975 (1921) *opinion after remand,* 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963 (1923) when discussing the liability of the parent United Mine Worker's Union for strike-related violence at the local level:

> A corporation is responsible for the wrongs committed by its agents in the course of its business, and this principle is enforced against the contention that torts are *ultra vires* of the corporation. But it must be shown that it is in the business of the corporation. Surely no stricter rule can be enforced against an unincorporated organization like this. Here it is not a question of contract, or of holding out an appearance of authority on which some third person acts. It is a mere question of actual agency, which the constitutions of the two bodies settle conclusively. If the International body had interfered or if it had assumed liability by ratification, different questions would have arisen.

Plaintiff contends that the *Coronado* rule applies only in strike situations and evinces a higher standard for liability than would ordinarily apply. Plaintiff argues that this higher standard is the one codified in § 6 of the Norris-LaGuardia Act,[26] applicable in

---

**25.** In *NLRB v. Int'l Longshoremen's Union,* 283 F.2d 558 (9th Cir. 1960), the court gave a good outline of instances where an International Union was found liable.

> In other cases an international union has been considered engaged in a joint enterprise with a local or responsible for the activities of the local and its agents when the International admitted having joined the local in authorizing the general conduct which led to the unfair practices, *see Int'l Longshoremen's Union,* 79 N.L.R.B. 1487, 1513–14 (1948), when the international advised, sympathized or financially supported such general conduct, *Cory Corp.,* 84 N.L.R.B. 972 (1949), when the international through its constitution or bylaws or by some other means commanded or required the activities resulting in the unfair labor practices, *see N.L.R.B. v. Millwrights' Local 2232,* 5 Cir., 1960, 277 F.2d 217, 221; *American Newspaper Publishers Ass'n,* 104 N.L.R.B. 806 (1953), or when the Intenational controlled the operations of the local, *see Int'l Brotherhood of Teamsters, etc. v. United States,* 4 Cir., 1960, 275 F.2d 610, 612–614.

This court endorsed the above analysis in *Harnischfeger v. Sheet Metal Workers Int. Ass'n,* 436 F.2d 351, 356 (6th Cir. 1970).

**26.** § 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106 states:

> "No officer or member of any association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after *actual knowledge thereof.*"

This stiffer standard for union liability in a strike situation is discussed in *U.M.W. v. Gibbs,* 383 U.S. 715, 735–42, 86 S.Ct. 1130, 1143–47, 16 L.Ed.2d 218 (1966). *See e. g. Riverside Coal Co. v. United Mine Workers,* 410 F.2d 267 (6th Cir.), *cert. denied,* 396 U.S. 846, 90 S.Ct. 89, 24 L.Ed.2d 95 (1969).

In § 301(e) of the Taft-Hartley Act, 29 U.S.C. § 185(e), Congress chose to have ordinary agency rules apply when dealing with an alleged breach of collective bargaining agreement. In the Landrum-Griffin Act, Congress did not state which standard should apply. We think it reasonable to apply ordinary agency

labor-strike situations only. Plaintiff is wrong, *Coronado* simply states the common law agency rule of respondeat superior, as applied to a labor union generally. The Supreme Court's recent decision in *Carbon Fuel Co. v. United Mine Workers*, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979) demonstrates this. There, the Court found no basis for holding an international union liable for a strike "not authorized, participated in, or ratified by it." *Id.* at 414. The Court made clear that this standard was that of common law agency, as codified by Congress in § 301(e), 29 U.S.C. § 185(e) *id.* The Court also made clear that this was the standard originally used in *Coronado*.[27]

The question which remains, then, is whether either Local 18 or the parent International Union of Operating Engineers could be liable under the above agency standard for the beating of John Shimman.

### A. Liability of Local 18

■ We see ample evidence in the record supporting a finding of liability against Local 18. The conduct of John Frank and John Possehl is the basis for this liability. Frank, of course, was the appointed head of district two as well as Vice-President of the local. Possehl was the Business Manager of the local.

Much of the evidence in the record regarding John Frank's conduct has already

been outlined above. There is more. Ervin Shimman testified that he had a lengthy telephone conversation with John Frank on October 14, 1971. Ervin Shimman testified that during this conversation Frank made numerous threats, including "if you don't go along with me, you are my enemy , and I destroy all my enemies." Frank also stated: "I am the hatchetman from Cleveland. I come here to chop heads and you are one of the heads I am going to chop."

The next day, Ervin Shimman spoke with John Possehl and informed him of John Frank's threats. Possehl did intercede with Frank and arranged for Ervin Shimman to get a job referral to which he was clearly entitled. At about this time, John Frank was denying work assignments to Glenn Oberle and Walter Shimman.[28] Walter Shimman complained to John Possehl about this, but received no satisfaction. Walter Shimman testified that he outlined Frank's conduct to John Possehl and requested Possehl to remove Frank from the district before there was trouble. Possehl's response was "no, I sent him here for a job and he is going to do it. I know there is trouble in this district and I know it is in the office." [29] On September 16, 1971, Glenn Oberle wrote to John Possehl, also outlining John Frank's conduct. Possehl sent back a non-committal letter but apparently took no

---

principles. We see no indication in the Landrum-Griffin Act that Congress meant to impose any higher standard of proof.

27. *U.M.W. v. Patton*, 211 F.2d 742, 747 (4th Cir.), *cert. denied*, 348 U.S. 824, 75 S.Ct. 38, 99 L.Ed. 649 (1954), relied upon by the plaintiff, does suggest that the *Coronado* standard is not that of ordinary agency. *Carbon Fuel Co. v. United Mine Workers*, 444 U.S. 212, 217, 100 S.Ct. 410, 414, 62 L.Ed.2d 394 (1979), however, shows that it is:

Congress' reason for adopting the common-law agency test [in 301e], and applying to unions the common-law doctrine of respondent superior, follows the lead of Chief Justice Taft in *Coronado Coal Co. v. UMWA*, 268 U.S. 295, 304, 45 S.Ct. 551, 554, 69 L.Ed. 963 (1925), that to find the union liable "it must be clearly shown . . . that what was done was done by their agents in accordance with their fundamental agreement of association."

28. As previously indicated, this controversy ended up before the National Labor Relations Board, whose determination in favor of Walter Shimman and Glenn Oberle was enforced by this court. Both Walter Shimman and Glenn Oberle testified at the trial below.

29. Walter Shimman also testified that Possehl said he did not think that John Frank's conduct was right and he (Possehl) would look into it. However, so far as the record shows, Possehl did nothing.

Later on, in April of 1972, Walter Shimman complained once again to John Possehl about John Frank. Frank was discriminating against Walter Shimman's son in job referrals. Possehl promised to intercede, but did not. The discrimination stopped after Walter Shimman called Local 18's counsel and threatened legal proceedings.

action. The testimony regarding John Possehl is unrefuted.[30]

The plaintiff argues, and the district court apparently found, that Possehl sent Frank to suppress the long-time dissidents in District Two. It is clear that Possehl failed to act when informed of John Frank's abusive conduct.[31] Although there is no direct evidence in the record of open antagonism between Possehl and the dissidents, it is obvious that their interests were opposed. Possehl, as Business Manager of Local 18, was a key official opposed by the dissidents. Indeed, they ran candidates against him. Possehl essentially did nothing when he received notice of John Frank's illegal and highhanded conduct. Possehl at the very least had an obligation to see to it that his subordinate, John Frank, did not flout the law.

The conduct of Frank and Possehl, in our opinion, justifies finding Local 18 liable. Frank was the district representative who ran District Two on behalf of Local 18. His long-term anti-dissident conduct was within the scope of his authority. Frank's conduct in instigating the beating of John Shimman is imputable to the local union. The local's liability also stems from Business Manager John Possehl's inaction despite continuing anti-dissident conduct by John Frank.[32]

**30.** John Possehl is a mysterious figure in this litigation. He was not sued individually. Yet his conduct was the basis for the International's liability and a partial basis for the local's liability. No one took his deposition. He did not testify at trial. The record does not even *show how long he has been Business Manager* of local 18, although it appears that he held that post since at least 1959.

**31.** It is stretching things a bit to say that Possehl sent Frank to silence the dissidents. This is especially true since Frank was first appointed district representative for district two in 1968. The beating took place in 1972. On the other hand, there was apparently continual *friction between Frank and the dissidents from* the time Frank first arrived. The district court's conclusion that Frank turned to violence after other methods failed is a permissible inference given evidence of escalating conflict over the years.

**32.** This inaction was such that the district court could have reasonably concluded that Possehl authorized Frank's conduct.

## B. Liability of the International Union

While we affirm the finding of liability against the local union, we see no basis for the district court's finding of liability against the International. Throughout its opinion, the district court referred to both unions as if though they were one and the same. They are not.

The International Union is a separate body from the local. The acts of the local and its agents cannot automatically be imputed to the International. This is clear from the International Union of Operating Engineers' Constitution which defines the relationship between the International and its affiliated locals. Under the constitution, local unions govern themselves and transact business on their own behalf.[33] Local unions can call strikes on their own, except when a collective bargaining agreement is in existence or when the local union desires the International's help with strike benefits.[34] Local unions elect their own officers, pass their own by-laws, transact business and discipline members.

Plaintiff argues that the local is an agent of the International because of the International's retention of substantial regulatory and supervisory powers.[35] This ig-

**33.** Constitution, Art. XXIII. For example, the local union leadership can negotiate and enter into collective bargaining agreements subject to the approval of the local membership.

**34.** Constitution, Art. XXIII, Subdiv. II(b), (c), *Constitution, Art. XXIII, Subdiv. II(e).*

**35.** Plaintiff points out that the International retains the right to suspend or remove local officials and take over the conduct of local union business under a variety of circumstances such as fraud or mismanagement. Constitution, Art. III, subdiv. 7; Art. VI, subdiv. 3. In addition, the local union must be organized and operated in the manner outlined in the International Constitution.

A provision in Art. XXIII, subdiv. 4(b) of the International Constitution is the subject of dispute. This provision requires that the President of the International approve in writing all local union employment contracts. Plaintiff cites this as a key example of the International's control over the local. The problem is that this provision was never literally interpreted by

nores the local's substantial autonomy in handling its own affairs. The local is simply not an arm of the International for all purposes.[36]

The dispute over which this case is about was a local matter. The record shows that dissident activities were directed to correct certain abuses of power by local union leaders, notably at the district level. According to the dissidents, the local union leadership did whatever it could to keep itself in power and reward its friends. The International Constitution left the running of day to day local affairs to locally elected union representatives (such as John Possehl) and their appointees (such as John Frank). The wrongful conduct of these local union leaders cannot be imputed to the International, absent proof of actual International participation or ratification. Any other holding would render the International Union of Operating Engineers liable for any misconduct of locally elected union officials. We decline to so expand union liability concepts.[37] Under some circumstances, a local union's officers or agents can be deemed to act on behalf of the International. We do not see how this can be true when dealing with a local controversy between locally elected union officials and a minority of the local membership.

In the alternative, plaintiff argues that John Possehl's conduct must be deemed to be that of the International. This is because Possehl was one of eleven general Vice-Presidents of the International, in addition to being Business Manager of the local. We do not agree. It is clear that any wrongful conduct by John Possehl was done in his capacity as Business Manager of Local 18. The fact that he was also an International Vice-President is, on these facts, irrelevant. It is an established principle of agency law that if an agent serves two masters, his conduct may be on behalf of one, the other, neither, or both masters, depending on the facts.

In this case, the fact that John Possehl was an International Vice-President was a coincidence. It was in his capacity as elected Business Manager of Local 18 that Possehl appointed John Frank to run District Two. The only reason why the dissidents had any dealings with Possehl at all was because Possehl was the business manager of the Local. In fact, dissident correspondence to Possehl always addressed him in his capacity as Business Manager and not as an International Vice-President. There is simply no evidence that anything Possehl

the International. The International required that it approve only written employment contracts of specific duration. That way, a local union leader could not lock the local union into a long-term employment contract. So long as local union employees were terminable at will, there was no need for International approval.

36. *Int'l Brotherhood of Teamsters v. United States*, 275 F.2d 610 (4th Cir. 1960), *cert. denied*, 362 U.S. 975, 80 S.Ct. 1060, 4 L.Ed.2d 1011 (1961) is distinguishable. That case found extensive control by the International over the Local. However, there is language in that case which suggests that extensive restrictions on local union autonomy contained in the International Constitution can make the local an agent of the International for all purposes. We have problems with this broad view. The International Constitution must be assessed when determining agency questions and its provisions are entitled to some weight. *See Local Union 984 v. Humko Co.*, 287 F.2d 231, 241–42 (6th Cir. 1961), *cert. denied*, 366 U.S. 962, 81 S.Ct. 1922, 6 L.Ed.2d 1254 (1961). However, what should matter is not so much the International's theoretical control over the local as the

nature and extent of actual control. *See Harnischfeger Corp. v. Sheet Metal Workers Int. Assoc.*, 436 F.2d 351 (6th Cir. 1970); *NLRB v. Int. Longshore & Warehouse Union*, 283 F.2d 558 (9th Cir. 1960).

37. In *Int'l Union of Operating Eng. Local No. 675 v. Lassitter*, 295 So.2d 634 (Fla.App.1974), *quashed on other grounds*, 314 So.2d 761 (Fla. 1975), *on remand*, 325 So.2d 408 (Fla.App. 1975), the court stated:

". . . the International [Union of Operating Engineers] constitution specifically provides for its complete domination over the local. The International president may suspend or revoke Local charters. The constitution provides the International with power to prohibit Locals from taking any action with an employer unless authorized by the International. In addition, the Local is referred to in the constitution as a 'subordinate subdivision' of the International"

We cannot agree with this broad language in the Florida court of appeals analysis. We see no "complete domination" by the International.

did or did not do vis-a-vis the dissidents was done on behalf of the International.

Aside from John Possehl, there exists no connection between the International and the beating of John Shimman. John Frank was not an officer or employee of the International, nor was there any evidence that he ever acted on behalf of the International. The same thing is true of James and Terry Grothaus. Nor is there any evidence that the International ratified the beating or any of John Frank's anti-dissident activities. Under the International Constitution, only the general president or the general executive board could do that. Simply stated, there is no proof that anyone acting on behalf of the International in any way encouraged, participated in or ratified the beating of John Frank.

 Plaintiff makes one final argument. He claims that the International was under a duty to oversee and correct the anti-dissident abuses which were going on within Local 18. He finds this duty in the Landrum-Griffin Act,[38] in the common law,[39] and in the International's Constitution.[40] Once again, plaintiff points his finger at John Possehl and accuses him of breaching these duties in his capacity as an International Vice-President.

 We reject this argument. It is an attempt to find an international union vicariously liable for mere inaction on the part of its officers.[41] In the collective bargaining area, Congress favors arbitration and conciliation. Congress does not favor strikes which breach collective bargaining agreements. Yet, even if an illegal strike takes place, an international union is not liable if it fails to take steps to end the strike, so long as the union does not authorize, encourage or ratify the strike. *Carbon Fuel Co., supra; North America Coal Co., supra.* We think that the same law should apply here. An international union which does not authorize, encourage or ratify § 101 violations should not be held liable for them. Otherwise, International Unions could be destroyed by liability findings based on a hindsight analysis of what they should have done. Like the Supreme Court in *Carbon Fuel Co.*, we will not imply an obligation to act from alleged general duties.

## IV. DAMAGES

### A. Actual Damages

The district court awarded John Shimman $107,067.99 compensatory damages. Of this amount, $32,067.99 was for medical bills and lost wages and $75,000 was for pain and suffering. The medical bills to-

---

**38.** Plaintiff relies on 29 U.S.C. § 501, which establishes fiduciary duties for officers and agents of unions. *See e. g. Sabolsky v. Budzanosky*, 457 F.2d 1245 (3d Cir. 1972), *cert. denied*, 409 U.S. 853, 93 S.Ct. 65, 34 L.Ed.2d 96 (1973). We seriously doubt that the fiduciary duty of § 501 is applicable here. *See Lux v. Blackman*, 546 F.2d 713, 717–18 (7th Cir. 1976) and cases cited.

**39.** Plaintiff argues that the fiduciary duty codified in 29 U.S.C. § 501 also existed at common law. According to the plaintiff, this common law duty means that a union officer must "exercise good faith in investigating and reporting any suspected improper activity which is detrimental to the interests of the organization or its members." Repl. Br. at 17. We need not discuss this issue any further except to note that none of the authorities cited by the plaintiff supports this breathtaking proposition.

**40.** Here, the plaintiff relies on various provisions in the International Constitution which *authorize* the International Union to direct or supervise the local under some circumstances. In addition, any International officer, such as John Possehl, may file charges against a member. From this, the plaintiff would have us find a duty to "come forward with information of wrongdoing if necessary to protect the membership." Repl. Br. at 19.

**41.** In *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), the Court refused to find liability under 42 U.S.C. § 1983 where city and police officials had failed to control police misconduct on the street. The Court rejected plaintiffs' argument in that case that the officials were liable for failing in their duty to properly supervise their subordinates. *Id.* at 375–76, 96 S.Ct. at 606. *Accord Wilson v. Beebe*, 612 F.2d 275 (6th Cir. 1980). In this case, there does not even exist a direct supervisory relationship between the International Union Officers and the local union.

taled just over $8,000. No one disputes them. The lost wage award of $24,058.19 is challenged on appeal. The district court did not state how it computed this amount. An examination of days and hours of work lost for the years 1972–74, however, reveals that the court's finding is reasonable. Plaintiff presented evidence that he missed 488 hours of work in 1972, 608 hours in 1973 and 280 hours in 1974 due to hospitalization and illness resulting from his injuries. Even including this lost time, John Shimman worked less than average hours in each of the years in question. Accordingly, additional sums were added to compensate him for his below average earnings. True, this latter computation is open to some doubt because it assumes that all of John Shimman's below average working hours from 1972–1974 were due only to the beating and not to any other cause. However, there was uncontradicted medical testimony in support of this proposition. In addition, the total lost wage is reasonable if one compares John Shimman's 1970–1972 pre-beating earnings with his 1972–1974 post-beating earnings. The difference is about $25,000.

Defendants also attack the $75,000 pain and suffering award as excessive. They emphasize that John Shimman suffered no organic injury except a small cut on the back of his hand while he protected his head from Terry Grothaus' kicks. It is true that x-rays and lab tests were negative and that John Shimman required no surgery. There was, however, extensive evidence presented that John Shimman suffered very real psychiatric problems because of the beating. Doctors who treated John Shimman immediately after the beating diagnosed him as suffering from a cerebral concussion. He complained of pain, dizziness, loss of memory. Doctors and nurses noted that he was nauseous, restless, afraid and occasionally spoke incoherently. For the next two years, plaintiff suffered from anxiety, tension and depression. He was hospitalized several times and given both electroshock and insulin shock treatments. He has continued to receive psychotherapy and medication.

Defendants presented no medical evidence in opposition to the plaintiff's extensive presentation. Defendants did suggest that perhaps the plaintiff was malingering or exaggerating his injuries. However, they presented no evidence to this effect. The plaintiff's doctors testified that he was not faking. The plaintiff underwent extensive therapy and continues to take medication. Still, he tried to, and did work after the beating, albeit fewer hours than before. There is no evidence of malingering in this record.

Defendants also suggest that plaintiff's difficulties stemmed from his personality structure and not from the beating. It is true that the psychiatric testimony labeled plaintiff's personality structure as passive-aggressive. All that this means, however, is that the plaintiff's personality may have made it difficult for him to bounce back from the physical and emotional trauma of the beating. However, the *cause* of plaintiff's anxiety, depression, etc., was the beating. Defendants must take their victim as they find him. Prosser, Law of Torts, 261–62 (4th ed. 1971); Restatement 2d of Torts § 461 (1965).

Given the uncontradicted medical testimony, we do not find excessive the district court's award of $75,000 for pain and suffering. The award was within the bounds of discretion.

### B. Attorneys' Fees

The district court awarded plaintiff $75,000 in attorneys' fees. The parties have stipulated that the amount was reasonable. The only question is whether they should have been awarded.

Attorney's fees are allowed in § 412 suits brought to vindicate § 101 rights. *Hall v. Cole*, 412 U.S. 1, 14, 93 S.Ct. 1943, 1950, 36 L.Ed.2d 702 (1973). This is true under two theories: 1) when defendants act maliciously, in bad faith; 2) where plaintiffs' action has resulted in a common benefit. *Hall v. Cole, supra.* Attorneys' fees are also allowed in assault and battery

cases under Ohio law. *Gates v. City of Toledo*, 57 Ohio St. 105, 111, 48 N.E. 500 (1897). The district court found that the defendants had acted in bad faith and awarded attorney's fees on that rationale. The district court also thought that Frank and the Grothaus' had lied at trial. As we have previously stated, the record supports the district court's finding that John Frank encouraged or directed the Grothaus' beating of John Shimman. We think that this finding warrants the award of attorneys' fees because of defendants' malicious conduct. We do not need to discuss the "common benefit" rationale.

## V. PUNITIVE DAMAGES

■ The district court awarded a total of $675,000 in punitive damages—$250,000 against the International, $250,000 against Local 18, $75,000 against John Frank, $75,000 against James Grothaus and $25,000 against Terry Grothaus. Because of our previous finding that the International Union could not be liable, the punitive damage award against it cannot stand. The question is whether the remaining punitive damages awards can stand. Punitive damages, where legally appropriate, should be awarded to punish but not to destroy.

As a threshold matter, the defendants argue that punitive damages are unavailable under § 101. This issue is uncertain in light of the Supreme Court's recent decision in *International Brotherhood of Electrical Workers v. Foust*, 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979). There, the Court ruled that punitive damages could not be awarded against a union which breached its duty of fair representation under the Taft-Hartley Act. The Court specifically left open the issue of the availability of punitive damages under § 101. *Id.* at 2125 n. 9. Four members of the Court who disagreed

with the majority's *per se* rule, however, noted that the rationale for the majority's opinion also extended to § 412 suits. *Id.* at 2125.

The courts of appeals are unanimous on the issue, however. In *Int'l Brotherhood of Boilermakers v. Braswell*, 388 F.2d 193 (5th Cir.) *cert. denied*, 391 U.S. 935, 88 S.Ct. 1848, 20 L.Ed.2d 854 (1968) Judge Wisdom wrote that punitive damages are allowable on a showing of "actual malice or reckless or wanton indifference" by a union for the rights of its members. *Id.* at 199. That holding has been endorsed by the second and ninth circuits. *Morrisey v. National Maritime Union*, 544 F.2d 19 (2d Cir. 1976); *Cooke v. Orange Belt District Council*, 529 F.2d 815 (9th Cir. 1975).

This court, in *McCraw v. United Association of Journeymen & App. of Plumbing*, 341 F.2d 705, 706–07 (6th Cir. 1965) strongly suggested that punitive damages were unavailable under § 101.[42] *McGraw*, however, has been subject to severe criticism by other courts. *See Feltington v. Moving Picture Machine Operators*, 605 F.2d 1251, 1257–1258 n. 4 (2d Cir. 1979); *Simmons v. Avisco Local 713*, 350 F.2d 1012, 1018 (4th Cir. 1965). *See also Hildebrand v. Bd. of Trustees*, 607 F.2d 705, 707, 708 n. 4 (6th Cir. 1979).

■ We need not address *McGraw's* present viability. The reason is that the underlying conduct complained of was an assault and battery under Ohio law. Punitive damages are clearly available under this pendant state claim, which is coextensive with the § 101 claim.[43] Indeed, punitive damages in such situations have become "common-place." *Ranells v. City of Cleveland*, 41 Ohio St.2d 1, 321 N.E.2d 885, 887 n. 2 (1975). The question remains whether the punitive damages awards were excessive[44] and whether punitive damages

---

**42.** The reason for this is that *McCraw* states that the § 101 suit there filed was "essentially an equity proceeding for reinstatement as a member of the Local Union, with the recovery of money damages being merely an incident to such relief." 341 F.2d at 709.

**43.** *See* n. 10, *supra*.

**44.** The district court correctly outlined the legal principles which are applicable here:

The law as to the amount of punitive damages is expressed in 1 OJI 349, *Damages* § 23.70c, as being an amount that should be fair and reasonable under all the circumstances. It should not be excessive, nor activated by passion and prejudice. It rests in

should have been awarded against all defendants. We are, of course, aware that punitive damages awards are not favored by the law and are awarded only where willful and wanton conduct occurs. *Marr v. Rife*, 503 F.2d 735 (6th Cir. 1973). We are also aware that under Ohio law there need not be "any mathematical relationship between the actual and punitive damages in a particular case." *Wood v. Stark Tri-County Building Trades Council*, 473 F.2d 272, 274 (6th Cir. 1973).

■ The punitive damages awarded here were, in some respects, excessive. Although we appreciate the district court's outrage at defendants' conduct, the truth is that this suit only seeks redress of one of dissident's wrongs. It is true that the incumbent leadership's earlier conduct against various dissidents can and should be taken into account in determining punitive damages. This earlier conduct demonstrates the malicious motivation behind the beating of John Shimman.[45] However, the earlier conduct cannot itself be a basis for recovery. Indeed, most of the other clashes between John Frank, *et al.* and the dissidents did not involve John Shimman, they involved his brothers and other dissidents.

We also conclude that we should direct a remission of punitive damages on this appeal instead of remanding for a recomputation. In two recent cases, this court has recalculated damages on appeal instead of remanding. *Clissold v. St. Louis-S.F.Ry. Co.*, 600 F.2d 35 (6th Cir. 1979); *Drayton v. Jiffee Chemical Corp.*, 591 F.2d 352 (6th Cir. 1978). Each of these cases was decided over strong dissent. As Judge Engel emphasized in *Drayton, supra*, "where, in a bench trial, an award of damages is found to be excessive, the preferred course is to refer the case back to the court which originally tried it for reconsideration." *Id.* at 366.

■ Nonetheless, as in *Drayton, supra*, we find this case appropriate for direct remission here. This case has been in the courts for over six years. Both sides deserve a final adjudication. The only damages we remit are punitive damages. We are in as good a position as the district court on this issue. We fully accept the court's finding of heinous behaviour. The data concerning the defendants' financial status is plain on the record. Thus, we need not weigh conflicting testimony. *See Guzman v. Western State Bank of Devils Lake*, 540 F.2d 948, 954 (8th Cir. 1976) (remission of punitive damages); *Texas Co. v. R. O'Brien & Co.*, 242 F.2d 526, 529 (1st Cir. 1957) (remission of damages where record below is undisputed). *Cf. Petition of United States Steel Corp.*, 479 F.2d 489 (6th Cir.), *cert. denied*, 414 U.S. 859, 94 S.Ct. 71,

---

the sound discretion of the fact-finders, and should be determined from all the evidence in the case. Devitt & Blackmar's *Federal Jury Practice and Instructions*, Vol. 2, Page 253, states that the amount of punitive damages "must be fixed with calm discretion and sound reason, and must never be awarded, or fixed in amount, because of any sympathy, or bias or prejudice with respect to any party to the case.

While the plaintiff in argument has laid emphasis on the necessity of making punitive damages large enough in amount to be really painful to entities which possess great wealth, and this Court has been using the terms "punitive damages" and "smart money," it must not be overlooked that the basic reason for any use of punishment by our system of justice is not merely to cause the wrongdoer to suffer, but to deter wrongdoing; "to serve as an example or warning to others not to engage in such conduct" Devitt & Blackmar, *op. cit.* P. 202; "to make an

example not only for the private good of the plaintiff, but for the public good, for the purpose of teaching other persons not to do likewise." 2 OJI 597, *Damages* § 259.29.

It is also necessary to remember that if punishment is to deter the one punished, it must not be so severe that the memory of the wrongdoing will be blotted out by resentment over the pain of the punishment. Awards of millions against anyone no matter how wealthy, tend to raise in the minds of both the wrongdoer and the public the thought, not of deterrence, but that what is being done is being done because of what the wrongdoer is, rather than what he did.

45. Defendants claimed that this evidence was irrelevant and inadmissible. This argument is meritless. The evidence shows the motive or intent behind the beating as well as malice for punitive damages purposes. *See* F.R.E. 401, 402.

38 L.Ed.2d 110 (1973) (remission of damages after district court failed to recalculate damages properly on initial remand.)

### A. John Frank

John Frank, of course, was the dissidents' main antagonist. The evidence supports the district court's determination that Frank instigated the beating of John Shimman. The district court assessed punitive damages at $75,000. John Frank's income in 1973, 1974 and 1975 was $22,106.00, $22,447.00 and $26,763.00 respectively. His net worth in 1975 was $28,000. We think that John Frank's conduct warrants imposition of punitive damages. We think that $75,000 is excessive. Given his financial situation, we believe that $20,000 is the maximum sum which should be awarded as a deterrent measure.

### B. James Grothaus

James Grothaus knocked John Shimman to the floor. The district court also found that Grothaus was a ringleader in the plan to beat a dissident. The record supports this finding. The district court assessed punitive damages at $75,000. James Grothaus' income in 1972, 1973 and 1975 was $20,410.94, $27,454.64 and $43,601.00 respectively. His net worth in 1975 was $23,675.00. We also think that $75,000 is excessive. We believe that $20,000 is the maximum deterrent sum which should be awarded.

### C. Terry Grothaus

Terry Grothaus kicked John Shimman several times after Shimman had been knocked to the floor. The district court assessed punitive damages at $25,000. Terry Grothaus is a Vietnam veteran who suffered from epilepsy from head wounds. As a result he receives a government pension of $4,272.00 per year. In 1973, 1974 and 1975, Terry Grothaus earned $11,095.00, $9,468.00 and $10,414.00 respectively. These sums were in addition to his pension.

Terry Grothaus' conduct in kicking a defenseless man while he lay on the floor justifies an award of punitive damages. However, given his limited financial means, we think that $5,000 will accomplish the deterrent effect sought by the district court.

### D. Local 18

Perhaps the most difficult judgment to be made concerns the liability of Local 18 for punitive damages. We have previously detailed the evidence which renders Local 18 liable for the conduct of John Possehl and John Frank. Local 18's assets are over $2,500,000. Thus, unlike the case of the individual defendants, this award is not, on its face, excessive. However, the ones who will end up paying for the punitive damages award are the union members. For this reason, courts should be slow to award huge punitive damages awards against unions.[46] *See Int'l Brotherhood of Elect. Workers v. Foust, supra.* The district court assessed punitive damages at $250,000. Keeping in mind the trial court's generous award of actual damages—which is likely to be collected from Local 18—we think that the punitive damages award, while warranted, is excessive. The sum of $100,000 should prove adequate to deter wrongdoing by local unions in Local 18's position.

## VI. CONCLUSION

In conclusion, we reverse the finding of liability against the International Union and remand with directions to dismiss. We affirm the judgment of liability against all other defendants. We affirm the award of $107,873.99 actual damages, assessed jointly and severally against all defendants. We

---

**46.** The Ohio Supreme Court has expressed similar concerns when discussing the liability of corporations for punitive damages:

"[C]orporations may render themselves liable, by the malicious misconduct of their agents or servants while acting within the scope of their employment, to exemplary and punitive damages; but it is a doctrine capable of being greatly abused, and courts ought to be careful to see to it that it is not misapplied."

*Logsdon v. Graham Ford*, 54 Ohio St.2d 336, 338, 376 N.E.2d 1333 (1978), *citing Pittsburg, Fort Wayne & Chicago R.R. Co. v. Slusser*, 19 Ohio St. 157, 162 (1869).

also affirm the award of $75,000 in attorney's fees against all defendants. We modify the award of punitive damages against Terry Grothaus from $25,000 to $5,000. We modify the award of punitive damages against James Grothaus from $75,000 to $20,000. We modify the award of punitive damages against John Frank from $75,000 to $20,000. We modify the award of punitive damages against Local 18 from $250,000 to $100,000. As modified, the judgment of the district court is affirmed. Each side will bear its own costs.