Daniel P. QUINN

v.

Joseph L. DIGIULIAN, Jr., et al., Appellants.

No. 83–2065.

United States Court of Appeals, District of Columbia Circuit.

Argued April 26, 1984.

Decided July 13, 1984.

As Amended July 13, 1984.

William B. Peer, Washington, D.C., for appellants.

Stewart S. Manela, Washington, D.C., with whom Stanley J. Brown, Washington, D.C., was on the brief, for appellee.

Before ROBINSON, Chief Judge, WALD, Circuit Judge, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

In August, 1981, Daniel Quinn sued his union, Local 31 of the Tile, Marble, Terrazzo Finishers and Shopmen, AFL–CIO ("Local 31" or "the Local") and two of its officers, Joseph DiGiulian and Dennis Baugh, alleging that when he announced his decision to run as a candidate for business agent of Local 31 against the incumbent DiGiulian, he became the target of a relentless campaign of harassment—including trumped-up disciplinary charges, fines and suspension from the Local—culminating finally in his discharge from his job. A jury found that the Local and the individual defendants had violated the Bill of Rights provisions of section 101 of the Labor Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 411,[1] and section

---

1. Section 101 of the LMRDA, 29 U.S.C. § 411, provides in relevant part:

(a)(1) Equal rights.—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

(2) Freedom of speech and assembly.—Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings ...

....

(5) Safeguards against improper disciplinary action.—No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A)

609 of the LMRDA, 29 U.S.C. § 529.[2] The jury also found that the Local had violated the duty of fair representation implicit in the National Labor Relations Act (NLRA), 29 U.S.C. § 151–169. The trial judge found further that the defendant officers had violated their fiduciary obligations to Local 31 members under the LMRDA, 29 U.S.C. § 501.[3] The court upheld the jury award of compensatory and punitive damages and granted equitable relief.

The defendants appeal from several aspects of the district court judgment. They claim (1) that Count III of the jury verdict charged conduct for which Quinn had already obtained relief from the National Labor Relations Board (NLRB), and that the district court's jurisdiction was thus either preempted by the primary and exclusive jurisdiction of the NLRB or precluded by the "election of remedies" doctrine; (2) that the court improperly let certain of Quinn's "equitable" claims go to the jury; (3) that the court erred in permitting the jury to award punitive damages for violation of the duty of fair representation and of the LMRDA; and (4) that the court had no authority to waive certain jurisdictional prerequisites under section 501, and in any

event improperly ruled that the protection of members' political rights fell within the scope of that section.

We conclude that the district court erred in permitting the assessment of punitive damages under the duty of fair representation claim. Although we also have doubts as to whether Congress intended a union's fiduciary obligation under section 501 to encompass the protection of individual political rights of members, we find it unnecessary to decide that question because in this case the district court could have ordered the same relief for the same unlawful conduct under its undisputed authority in the Bill of Rights provisions of the LMRDA. In all other respects, we uphold the judgment of the district court.

## I. Background

Daniel Quinn, a construction worker and member of Local 31, was nominated for the office of business manager in November, 1978. Within one week his opponent, incumbent business manager DiGiulian, returned Quinn's dues payment and suspended him for failure to pay his dues. At the December, 1978, election meeting, DiGiulian challenged Quinn's status as a union

served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

2. Section 609, 29 U.S.C. § 529, provides as follows:

It shall be unlawful for any labor organization or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter. The provisions of section 412 of this title shall be applicable in the enforcement of this section.

Section 102, 29 U.S.C. § 412, provides for civil enforcement of sections 411, *supra* note 1, and 609:

Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate....

3. Section 501, 29 U.S.C. § 501, provides in part as follows:

(a) The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder; to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization....

The application of this section to the conduct at issue in this case is briefly discussed *infra* pp. 652–653.

member in good standing and thus disputed his eligibility for union office. Although Quinn was ultimately permitted to stay at the meeting and run for office, he lost the election. He objected that the election was unfair because the names of some candidates had been scratched off the ballot.

Quinn wrote to Pascal DiJames, the president of the International Union, to protest the election procedures, his suspension, and the continuing rejection of his dues. DiJames arranged for the acceptance of Quinn's dues and his reinstatement as a member, and ordered a new election to be held May 18, 1979. On the day of the second election, DiGiulian wrote to the president of Local 31, Baugh, charging Quinn with slander against DiGiulian and "disgraceful conduct" in violation of the Local 31 constitution and by-laws. On the same day, Baugh charged Quinn with violating the Local's constitution and by-laws by complaining directly to the International about the election and his suspension.

The Local 31 Executive Board held a hearing at which it found Quinn guilty and fined him $263.80. Quinn refused to pay the fine, and the Local consequently refused to accept his dues, thus putting him in arrears. In January, 1980, Quinn again wrote to DiJames to describe and protest the actions that had been taken against him; he requested that DiJames "see that this matter is straightened out."[4] DiJames responded that it was a Local Union matter, and forwarded Quinn's letter to Baugh.[5] In February, Quinn was suspended from Local 31 for his failure to pay the·

fine. At a meeting in March, Baugh notified the members that Quinn was no longer a member in good standing, and that any member caught working with him would be fined. As a result of this threat, at least one Local 31 member refused to work with Quinn on a construction project and Quinn was laid off.

Quinn brought an unfair labor practice charge against Local 31 in April, 1980. The NLRB, in a decision issued on September 30, 1981,[6] concluded that Local 31 had restrained Quinn in the exercise of his section 7 rights in violation of section 8(b)(1)(A) of the National Labor Relations Act (NLRA),[7] and had caused an employer to discriminate against him on grounds other than nonpayment of dues in violation of section 8(b)(2) of the NLRA.[8]

In August, 1981, shortly before the NLRB's final decision, Quinn initiated this suit in federal district court. The defendants moved to dismiss several counts and to strike Quinn's demand for a jury trial. The court issued a memorandum opinion in which it reviewed the undisputed facts and decided several· issues now before us on appeal. *Quinn v. DiGiulian*, Civil No. 81–1921 (D.D.C. Mar. 29, 1983) (hereinafter cited as *"Opinion"*). The court denied the defendants' motion to dismiss certain claims under the LMRDA on the ground that the NLRB had primary and exclusive jurisdiction over, and indeed had already ruled on, analogous claims under the NLRA. *Id.* at 5–6. The court also rejected the defendants' motion to dismiss claims that they had violated their fiduciary duty

---

4. *See* Appellants' Record Excerpts at 9–10.

5. *See* Appellants' Record Excerpts at 11.

6. *See* Tile, Marble, Terrazzo Finishers & Shopmen Int'l Union, Local 31, 258 NLRB 1143 (1981).

7. 29 U.S.C. § 158(b)(1)(A) provides that "[i]t shall be an unfair labor practice for a labor organization or its agents—(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7," 29 U.S.C. § 157, which guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to en-

gage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection..."

8. 29 U.S.C. § 158(b)(2) makes it an unfair labor practice for a labor organization

"to cause or attempt to cause an employer to discriminate against an employee ... with respect to whom membership in such an organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership."

under section 501 on the grounds that Quinn had failed to meet certain formal jurisdictional prerequisites to suit. *Id.* at 6–9. Finally, the court denied the defendants' motion to strike plaintiff's demand for a jury trial of his claims under the NLRA and the LMRDA. *Id.* at 11–13.[9]

After a ten-day trial in April, 1983, a jury found for Quinn on most counts and awarded him damages. Specifically, it found that DiGiulian had violated the LMRDA Bill of Rights for union members by "intimidating, harassing, coercing, threatening and discriminating" against Quinn because of his candidacy in the election (Count I); it found further that Baugh, DiGiulian and Local 31 had violated the Bill of Rights by bringing unfounded disciplinary charges against Quinn, trying him on the charges without due process, enforcing the resulting fine against him, and making false and malicious statements about him to the members (Count II), and by refusing Quinn's dues, suspending him for allegedly failing to pay his dues, and instructing members of the Local not to work on any jobs with him (Count III), all because he had run for union office. The jury found in addition that the Local had violated its duty of fair representation under the LMRA "by its course of harassment and illegal conduct" and by "procuring plaintiff's discharge from his employment," action the jury found to be "arbitrary, capricious, unfounded, unlawful, malicious, and intentionally against the plaintiff's interests" (Count V).[10]

In its judgment and order of June 16, 1983, the trial court upheld the verdict over the defendants' motion and ordered DiGiulian to pay a total of $7500 in compensatory and $3500 in punitive damages, Baugh to pay $5500 in compensatory and $2500 in punitive damages, and Local 31 to pay $14,500 in compensatory and $10,500 in punitive damages plus Quinn's costs.[11] The court found further that DiGiulian and Baugh, in violating Quinn's political rights, had breached the fiduciary obligations of union officers toward members mandated by 29 U.S.C. § 501; the court thus ordered them to "refrain from violating or chilling the exercise of LMRDA rights of Local 31 members." Finally, the court ordered all three defendants to "cancel and expunge the decisions ... to fine, suspend, and refuse to accept and record dues payments tendered by Daniel P. Quinn," to accept the dues payments of Quinn and any other members who exercised their federally protected rights, to publish a retraction and apology stating that Quinn had at all times been a member in good standing, and that the actions taken against him were illegal and unwarranted, and to refrain from interfering with Quinn's rights as a union member. This appeal followed.

## II. THE ISSUES

The defendants no longer dispute the facts on which all of the violations were predicated. They concede for the purpose of this appeal that the actions of Local 31, Baugh and DiGiulian were malicious and

---

**9.** Quinn had also brought a claim under 42 U.S.C. § 1985, charging a conspiracy to deprive him of the equal protection of the laws. In its memorandum opinion, the court denied the defendants' motion to dismiss the section 1985 claim. Opinion at 10–11. However, the claim was apparently withdrawn as it was not tried. In addition, the court denied Quinn's motion for summary judgment. The court refused to give collateral estoppel effect to the facts decided in either the NLRB proceeding or the Maryland District Court decision refusing to enforce the union fines against Quinn. *Id.* at 13–16.

**10.** Quinn had also alleged that the defendants had retaliated against him for filing unfair labor practices with the NLRB by filing suit to collect the fines levied against him (Count IV). How-

ever, the jury found for the defendants on this count.

**11.** *Quinn v. DiGiulian,* Civil No. 81–1921 (D.D.C. June 16, 1983). The precise breakdown of the damages (compensatory + punitive) awarded by the jury was as follows:

| | | |
|---|---|---|
| Count I: | $4000 + $1500 | against DiGiulian. |
| Count II: | $3500 + $2000 | against Baugh. |
| | $1500 + $1000 | against DiGiulian. |
| | $6000 + $3000 | against Local 31. |
| Count III: | $2000 + $500 | against Baugh. |
| | $2000 + $1000 | against DiGiulian. |
| | $1000 + $0 | against Local 31. |
| Count V: | $7500 + $7500 | against Local 31. |

motivated by Quinn's electoral challenge to the incumbent union leadership. Nevertheless, they argue, the district court made several errors of law that exposed them to greater liability than is warranted.

## A. *District Court Jurisdiction Over Count III*

Under Count III, the jury found that the defendants had violated section 101—the Bills of Rights provisions—and section 609 of the LMRDA, 29 U.S.C. §§ 411, 529,

> by refusing to accept plaintiff's dues when he tendered them, by suspending plaintiff for allegedly failing to pay his dues, by instructing the members of defendant Local not to work on any jobs with plaintiff, and by doing all of these things because of plaintiff's participation and candidacy in the election for officers of defendant Local.

Local 31 argued to the district court and in its brief on appeal that the district court had no jurisdiction over the claims asserted in Count III because the conduct alleged was arguably an unfair labor practice and thus within the exclusive and primary jurisdiction of the NLRB. The Union pointed out, to bolster its preemption argument, that Quinn had actually litigated and won essentially the same claim before the NLRB, and had been awarded backpay, a cease-and-desist order and posting of notices. In oral argument before this court, however, counsel for the defendants characterized their jurisdictional argument differently, as one under the doctrine of "election of remedies": Even if Quinn could have chosen initially to proceed in federal court under the LMRDA Bill of Rights, he could not do so once having successfully pursued relief under the NLRA before the Board. Although we are aware of no decisions barring the pursuit of claims under the LMRDA on the basis of a prior successful NLRB proceeding, we examine the defendants' arguments in turn.[12]

We find that the district court's jurisdiction over Count III was not preempted by the exclusive jurisdiction of the NLRB. Under the preemption doctrine, state and federal courts generally may not adjudicate claims based on conduct that is arguably protected or arguably prohibited by the NLRA. *See San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). As the Supreme Court explained in *Amalgamated Association of Motor Coach Employees v. Lockridge*, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971),

> The principle of preemption that informs our general national labor law was born of this Court's efforts, without the aid of explicit congressional guidance, to delineate state and federal judicial authority over labor disputes in order to preclude, so far as reasonably possible, conflict between the exertion of judicial and administrative power in the attainment of the multifaceted policies underlying the federal scheme.

*Id.* at 286, 91 S.Ct. at 1918. Thus, although developed in the courts, the doctrine is designed to effectuate congressional intent. In *Lockridge*, the Supreme Court held that the preemption doctrine barred a state court from entertaining a breach of contract claim against a union for procuring the discharge of an employee, since the union's conduct was arguably protected by section 7 and arguably prohibited by section 8 of the NLRA, 29 U.S.C. §§ 157, 158.

Local 31, relying on *Lockridge*, argues that the essence of Count III is the union's attempt to procure Quinn's discharge on grounds other than his failure to pay dues, and that the claim is therefore within the exclusive jurisdiction of the NLRB because "it merely restates, under the guise of the LMRDA, an unfair labor practice, previously found by the NLRB under [s]ection 8(b)(2) of the Act." Brief for Appellants at 9. In other words, even though Count III charges conduct that violates the rights of

---

**12.** Although the defendants now present their argument under a different doctrinal rubric than that presented to the district court, the substance of their argument is the same—*i.e.,* that Quinn's LMRDA claim was barred because of the prior proceedings and backpay award under the NLRA.

union members under the LMRDA, and even though the LMRDA expressly provides for federal court jurisdiction over claims under the Bill of Rights provisions, *see* 29 U.S.C. § 412, the NLRB has exclusive jurisdiction under the preemption doctrine over conduct that also constitutes an unfair labor practice under the NLRA. We do not agree.

The district court properly relied on *International Brotherhood of Boilermakers v. Hardeman*, 401 U.S. 233, 91 S.Ct. 609, 28 L.Ed.2d 609 (1971), in rejecting defendants' argument. In *Hardeman*, a union member sued his union under a provision of the LMRDA Bill of Rights, 29 U.S.C. § 411(a)(5), alleging that he had been expelled without a full and fair hearing. The union contended that because Hardeman was seeking damages for loss of employment resulting from his expulsion, his real claim was essentially one of union discrimination in job referrals, and was within the exclusive competence of the NLRB. The Court rejected this argument in light of the explicit congressional purpose to refer claims under the LMRDA Bill of Rights to the federal courts. Furthermore, federal court jurisdiction over the claim at issue— the fairness of internal union disciplinary procedures—raised none of the concerns underlying the preemption doctrine.

> [T]he critical question in this action is whether Hardeman was afforded the rights guaranteed him by § 101(a)(5) of the LMRDA. If he was denied them, Congress has said that he is entitled to damages for the consequences of that denial. Since these questions are irrelevant to the legality of conduct under the [NLRA], there is no danger of conflicting interpretation of its provisions. And since the law applied is federal law explicitly made applicable to such circumstances by Congress, there is no danger that state law may come in through the back door to regulate conduct that has

been removed by Congress from state control.

*Id.* at 241, 91 S.Ct. at 614–615.

Most courts agree with the district court that *Hardeman* stands for the proposition that "NLRB jurisdiction over an unfair labor practice does not divest the federal courts of jurisdiction to hear an LMRDA claim arising out of the same pattern of misconduct." Opinion at 5. The district court quoted the Ninth Circuit's decision in *Benda v. Grand Lodge of International Association of Machinists*, 584 F.2d 308, 314 n. 2 (9th Cir.1978), *cert. denied*, 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979): "Obviously the doctrines of preemption and primary jurisdiction must yield to the extent necessary to prevent frustration of congressional purposes as expressed in the LMRDA." Opinion at n. 2. *See also Vandeventer v. Local 513, International Union of Operating Engineers*, 579 F.2d 1373, 1377 (8th Cir.), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978). The defendants contend, however, that *Hardeman* and its progeny dealt with purely internal union matters which are only of peripheral concern under the NLRA, and that claims based on union interference in the employment relationship, as they characterize Count III, are within the sole jurisdiction of the Board.

We need not decide whether *Hardeman* means that the preemption doctrine has no application whatsoever to claims under the LMRDA Bill of Rights, for Count III, as we read it, is confined to disciplinary measures taken against Quinn within the union, and stops short of alleging direct interference by the union in Quinn's employment relations. As the very least, *Hardeman* teaches that the preemption doctrine is not triggered by a claim that loss of employment was a compensable consequence of action in violation of the LMRDA.[13] Furthermore, the motivation behind the defendants' conduct—Quinn's participation and candidacy in the union election—is crit-

---

**13.** The fact that there was evidence before the jury of more direct interference by the union with Quinn's employment relations than was charged in Count III can hardly justify insulat-

ing the union defendants from LMRDA liability for the consequences of the unlawful disciplinary measures described in Count III.

ical to the LMRDA Bill of Rights claim but, like the fairness of disciplinary procedures in *Hardeman,* irrelevant to the legality of the union's conduct under the NLRA. Thus, even a narrow reading of *Hardeman* controls this case, and we therefore reject the union's challenge to Count III on preemption grounds.

There is, however, a later incarnation of the defendants' preemption argument. Their basic contention is that Quinn actually won an NLRB ruling, along with backpay and the usual cease-and-desist order and posting of notices, on essentially the same facts as those alleged in Count III: the union's successful attempt to have Quinn discharged by refusing his dues, suspending him and ordering his fellow union members to refuse to work with him.[14] The union defendants argue that, even assuming that Quinn could have chosen originally to bring his claim to either the district court or the Board, he could not do both, and is now barred by the "election of remedies" doctrine.

 The election of remedies doctrine is "a harsh doctrine not favored in jurisprudence and not to be unduly extended." *Louis Cook Plumbing & Heating, Inc. v. Frank Briscoe Co.,* 445 F.2d 1177, 1179 (10th Cir.1971). *See also Macklin v. Spector Freight Systems,* 478 F.2d 979, 991 (D.C.Cir.1973). The doctrine is based on an estoppel theory:

> One who, with full knowledge of facts upon which inconsistent claims for relief may be predicated, requires his adversary to defend against a version of the facts marshalled in support of one theory, cannot in good conscience subsequently pursue a claim resting upon re-

pugnant factual or legal bases. If, on the other hand, two causes of action that are not inconsistent arise from a single course of events, the doctrine of election of remedies does not require that a plaintiff, by choosing to assert one cause of action, be precluded from asserting the other.

1B J. Moore, Moore's Federal Practice ¶ 0.405[7] (2d ed. 1983). *See also Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.,* 630 F.2d 250 (5th Cir.), *reh'g denied,* 634 F.2d 1355 (5th Cir.1980). Because the defendants assert no inconsistency, and we can see none, between the claim asserted under the NLRA and that asserted under the LMRDA, the election of remedies doctrine has no application here.

At bottom, the defendants' argument rests simply on the supposed inequity of permitting Quinn two separate *remedies* for the same course of conduct. It is true that both the NLRB's backpay order and the jury's award of damages for the conduct charged in Count III were meant to remedy the consequences of the union's conduct in suspending Quinn and ordering his fellow members not to work with him. However, the defendants' argument that Quinn should not be permitted to recover twice for the same course of conduct misses the mark. First, the jury was instructed to subtract from its calculation of damages the amount of the NLRB's backpay award, thus alleviating any possibility of double recovery for those lost wages.[15] In addition, the defendants' argument overlooks the disparity in remedies available under the two acts. The Board, whose remedial powers are limited, awarded $836 in backpay and ordered Local 31 to cease and

---

**14.** Unlike the preemption argument, this argument goes to the supposed redundancy of the *remedies* awarded Quinn; it focuses less on any precise comparison between the conduct charged in Count III and that constituting an unfair labor practice and more on the fact that the remedies Quinn obtained under both the NLRA and the LMRDA were designed to compensate for the consequences of essentially the same actions by the union.

**15.** We have indicated, in the context of an employment discrimination suit under Title VII, 42 U.S.C. §§ 2000e et seq., that in the case of an employee who had successfully proceeded under a contractual grievance mechanism and "received a favorable award in the grievance proceeding, a court could not give him 'duplicate relief which would result in an unjust enrichment or windfall.'" *Macklin v. Spector Freight Systems,* 478 F.2d at 991 n. 21 (quoting *Bowe v. Colgate-Palmolive Co.,* 416 F.2d 711, 715 (7th Cir.1969)).

desist from its illegal conduct with respect to Quinn or any employee. By contrast, the jury in this action concluded that as a proximate result of much the same course of conduct Quinn had sustained compensable damages in the amount of $5000, to which the jury added $1,500 in punitive damages.[16]

Furthermore, even though much the same course of conduct was at issue in both the NLRB proceedings and the trial below, the defendants' motivation—critical under the LMRDA—was not at issue before the Board. Since it is the suppression or punishment of the political activities of union members that is at the heart of the LMRDA Bill of Rights, we cannot say that Quinn's successful unfair labor practice charges vindicated the same right as he claimed under the LMRDA in Count III. We conclude that, even though Quinn's successful unfair labor practice charge was based on approximately the same factual pattern as Count III in this action, both the rights vindicated and the remedies available under section 102 of the LMRDA for the misconduct charged in Count III are distinct from those in an unfair labor practice action under the NLRA. Count III was therefore properly before the court.

### B. Quinn's Right to a Jury Trial

Over the defendants' protests, the trial judge referred to the jury Quinn's claims under both the Bill of Rights provisions of the LMRDA and the duty of fair representation ("DFR") under the NLRA. The defendants repeat their contention here that the LMRDA and DFR claims were both primarily equitable in nature and should therefore have been tried by the judge.

#### 1. Jury Trial of the LMRDA Claims

The defendants argue that the essence of Quinn's action under the LMRDA was one for reinstatement to union membership, and that his claims for damages were merely incidental to that equitable claim. They rely heavily on *McCraw v. United Association of Journeymen*, 341 F.2d 705 (6th

Cir.1965), which held that no jury trial was available in an action under the LMRDA Bill of Rights for both equitable relief and damages. But in *Hildebrand v. Board of Trustees of Michigan State University*, 607 F.2d 705, 708 & n. 4 (6th Cir.1979), *cert. denied*, 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 168 (1982), and *Shimman v. Frank*, 625 F.2d 80, 101 & n. 42 (6th Cir. 1980), the Sixth Circuit sharply questioned the soundness of its own holding in *McCraw*, particularly in light of the Supreme Court's subsequent decisions in *Ross v. Bernhard*, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970), and *Curtis v. Loether*, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974).

In *Ross v. Bernhard*, which concerned a stockholders' derivative action, the Court held that "where equitable and legal claims are joined in the same action there is a right to a jury trial on the legal claims which must not be infringed by trying the legal issues as incidental to the equitable ones." 396 U.S. at 537–38, 90 S.Ct. at 738 (1970). In *Curtis v. Loether*, the Court held with respect to federal housing discrimination claims that the seventh amendment right to a jury trial applied to statutory claims "if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of laws." 415 U.S. at 194, 94 S.Ct. at 1008. The fair housing statute simply "define[d] a new legal duty, and authorize[d] the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach." *Id.* at 195, 94 S.Ct. at 1009. Every other circuit court that has considered the availability of a jury trial for claims under the LMRDA has disagreed with *McCraw* and concluded that there is a right to a jury trial on a claim for damages under the LMRDA Bill of Rights, whether or not equitable relief is also requested. *See, e.g., Feltington v. Motion Picture Operators Local 306*, 605 F.2d 1251, 1257 (2d Cir.1979), *cert. denied*, 446 U.S. 943, 100 S.Ct. 2169, 64 L.Ed.2d 799 (1980); *Simmons v. Avisco, Local 713*, 350 F.2d 1012,

---

**16.** The propriety of the award of punitive damages is considered *infra* pp. 648–652.

1018 (4th Cir.1965). *Cf. International Brotherhood of Boilermakers v. Braswell*, 388 F.2d 193, 197–98 (5th Cir.), *cert. denied*, 391 U.S. 935, 88 S.Ct. 1848, 20 L.Ed.2d 854 (1968) (only damages requested; reserving question of right to jury trial where equitable relief also requested).

■ We are persuaded by the reasoning of those cases. The LMRDA Bill of Rights, in creating a set of duties of unions toward their members and in providing for enforcement through civil suits for, in part, damages resulting from breach of those duties, created a new cause of action sounding in tort. Quinn's legal claims for damages—lost wages, mental distress, harm to reputation, etc.—proximately caused by conduct in breach of the legal duties imposed on unions and their officers by the LMRDA were not mere insubstantial appendages to his prayer for equitable relief. Under the reasoning laid down in *Ross v. Bernhard* and *Curtis v. Loether*, Quinn was entitled to a jury trial of those claims.

### 2. Jury Trial of the Duty of Fair Representation Claim

■ The same line of Supreme Court cases also compels our conclusion that Quinn was entitled to a jury trial on his claim for damages resulting from a breach of the duty of fair representation. Although the two leading circuit court cases holding that a jury trial was available for DFR claims, *Cox v. C.H. Masland & Sons*, 607 F.2d 138 (5th Cir.1979), and *Minnis v. UAW*, 531 F.2d 850 (8th Cir.1975), involved, as far as we can tell, claims for damages only, the Supreme Court's pronouncements in this area do not permit us to take away Quinn's right to a jury trial simply because he sought and was granted equitable relief in addition to damages. Although the duty of fair representation is judicially implied, it is simply a new legal duty, like the duties created by the LMRDA, the breach of which gives rise to liability for any damages that result. The trial judge thus properly sent to the jury the questions of whether the union had breached its duty of

fair representation and what damages, if any, Quinn suffered as a consequence; the court properly reserved for itself the question of what equitable relief, if any, Quinn was entitled to.

The defendants argue that *Del Costello v. Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), in which the Supreme Court held that the six-month statute of limitations for NLRB charges, and not any statute of limitations borrowed from state law, applied in DFR suits, compels the opposite result. But the Supreme Court's determination in *Del Costello* that DFR suits had no close analogy to ordinary state law actions so as to recommend a particular state statute of limitations offers little support for the union's argument that the DFR action is equitable in nature for seventh amendment purposes. In determining whether there is a right to a jury trial of claims under a modern statutory cause of action, the nature of the remedies authorized and sought has become a more reliable clue to whether the action is legal or equitable in nature than the existence of a precise common law analogy to the modern cause of action. *See Curtis v. Loether*, 415 U.S. at 196–97, 94 S.Ct. at 1009–1010. An action for damages for breach of the duty of fair representation, like a damages action for housing discrimination, is an action to enforce a legal right, and the plaintiff is entitled to a jury trial of that action.

We are fully cognizant of the danger that jury prejudice against unions in claims like Quinn's will infect the verdict and inflate damage awards. But an analogous, if not more acute, concern over the possible influences of prejudice against minority victims of housing discrimination was considered and rejected by the Supreme Court in *Curtis v. Loether* as a basis for denying the seventh amendment right to a jury trial of legal claims in a statutory cause of action. 415 U.S. at 198, 94 S.Ct. at 1010. We can only echo the Court's consolation in *Curtis* that "the trial judge's power to direct a verdict, to grant judgment notwithstanding the verdict, or to grant a new trial provides substantial protection against this

risk [of jury prejudice]." *Id.* The judge must be attentive to the danger of jury prejudice in LMRDA and duty of fair representation cases, and must be prepared to exercise its powers to guide the jury, to override a verdict or to reduce its award if necessary to insure a fair result.

## C. *The Availability of Punitive Damages*

The judge permitted the jury to award Quinn not only compensatory damages but punitive damages as well under both the LMRDA and the duty of fair representation. The defendants argue that the punitive damage awards are not authorized under either statutory cause of action.

### 1. *Punitive Damages for Breach of the Duty of Fair Representation*

█ In *International Brotherhood of Electrical Workers v. Foust,* 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979), the Supreme Court held that "damages may not be assessed against a union that breaches its duty of fair representation by failing properly to pursue a grievance." *Id.* at 52, 99 S.Ct. at 2128. The plaintiff would have us limit the holding of *Foust* to grievance handling and permit the award of punitive damages in this case, where the union breached its duty of fair representation by procuring Quinn's discharge because of his political activity within the union. The defendants argue that *Foust* announced a *per se* rule applicable to all fair representation suits and thus barred the jury's award of $7500 in punitive damages. We agree with the defendants.

Although the precise holding quoted above was made in the specific context of grievance handling, we do not believe this can be read as a limitation. First, Justice Blackmun, speaking for four members, concurred in the result only precisely because, in his view, "[t]he Court now adopts a *per se* rule that a union's breach of its duty of fair representation can never render it liable for punitive damages, no matter how egregious its breach may be." *Id.* at 52–53, 99 S.Ct. at 2128 (Blackmun, J., concurring). The majority made no objec-

tion to this broad characterization of its decision. On the other hand, the Court specifically responded to the suggestion of the concurrence, *id.* at 59, 99 S.Ct. at 2131, that its holding might extend to suits under the LMRDA Bill of Rights, reserving that question for another day. *See id.* at 47 n. 9, 99 S.Ct. at 2125 n. 9. We believe that the majority's response to the concurring justices strengthens our view that the Court meant to formulate a blanket rule for DFR suits. This also appears to be the view of the Fifth Circuit, *see Wells v. Southern Airways, Inc.,* 616 F.2d 107, 109 n. 1 (5th Cir.), *cert. denied,* 449 U.S. 862, 101 S.Ct. 166, 66 L.Ed.2d 78 (1980), and the Eighth Circuit, *see Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208, 1216 (8th Cir.), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981).

The reasoning of the *Foust* decision also supports a broad reading of its holding. The judicially-implied fair representation doctrine imposes on unions the duty to "represent fairly the interests of all bargaining-unit members during the negotiation, administration, and enforcement of collective bargaining agreements." *See Foust,* 442 U.S. at 47, 99 S.Ct. at 2125. This duty was implied from the NLRA by the Supreme Court as a necessary corollary and counterbalance to the union's power under the NLRA of exclusive representation of all members of the bargaining unit. *See Steele v. Louisville & Nashville Railroad Co.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). The Court determined in *Foust* that permitting punitive damage awards threatened to "impair the financial stability of unions and unsettle the careful balance of individual and collective interests which [the Supreme] Court has previously articulated in the unfair representation area." 442 U.S. at 48, 99 S.Ct. at 2126.

It is true that *Foust,* like the bulk of DFR suits, concerned the union's handling of a grievance. Thus, the Court stated, "[a]dditionally, the prospect of punitive damages in cases such as this could curtail the broad discretion ... afforded unions in handling grievances." Nevertheless, most

of the Court's analysis applies to the union's task of balancing individual and collective interests at every stage of the collective bargaining process, which is the context in which the duty of fair representation operates.

The plaintiff argues that in this case, in which the union procured his discharge on the basis of his electoral opposition to the incumbent officers, there were no countervailing collective interests to balance against Quinn's individual interest. Of course, in any particular case of an egregious breach of the duty it will appear that no collective interest could possibly justify the union's action. But *Foust* clearly rejected the notion that punitive damages could be awarded because the union's conduct was especially culpable. Thus, if the union here were charged with maliciously refusing to process Quinn's meritorious grievances because of his intra-union political activities, *Foust* would clearly bar any award. The union's arguably greater culpability in this case does not take it out from under the broad reach of *Foust*.

Neither is the particular manner in which the union breached its duty to Quinn—procuring his discharge—a rational basis for carving an exception to the broad reach of *Foust*. It is only because the union's action against Quinn can be understood as an aspect of the union's representation of him in collective bargaining that the duty of fair representation comes into play. If the union's action here were so remote from the daily administration of the collective bargaining relationship involved in *Foust* that the reasoning of that case had no application, we doubt that it would be a fair representation suit at all. We think the analysis of *Foust* extends logically to all aspects of the union's representation of employees in the collective bargaining process, and thus bars punitive damages in all

suits for breach of the union's duty to represent fairly all its members in collective bargaining. We therefore vacate the jury's award of $7500 in punitive damages against Local 31.

### 2. Punitive Damages Under the LMRDA Bill of Rights

Neither the Supreme Court nor this circuit has addressed the propriety of punitive damage awards under the LMRDA, which "involves different considerations" than the propriety of such awards in DFR suits at issue in *Foust*. 442 U.S. at 47 n. 9, 99 S.Ct. at 2125 n. 9. Those circuits that have considered the question are unanimous in concluding that punitive damages may be awarded where the union or its officials have acted with malicious intent or at least reckless and wanton indifference to the plaintiff's rights. *See, e.g., Vandeventer v. Local 513, International Union of Operating Engineers*, 579 F.2d 1373, 1379–80 (8th Cir.), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978) (at least where conduct malicious, *i.e.*, prompted by ill will against plaintiff); *Morrissey v. National Maritime Union*, 544 F.2d 19, 25 (2d Cir.1976); *Cooke v. Orange Belt District Council of Painters*, 529 F.2d 815, 820 (9th Cir.1976); *International Brotherhood of Boilermakers v. Braswell*, 388 F.2d 193, 200 (5th Cir.), *cert. denied*, 391 U.S. 935, 88 S.Ct. 1848, 20 L.Ed.2d 854 (1968). *But cf. McGraw v. United Association of Journeymen*, 341 F.2d 705, 710 (6th Cir.1965) (affirming without discussion district court decision that only compensatory damages available under § 102). With some qualifications, we agree.

Section 102 of the LMRDA, 29 U.S.C. § 412, authorizes the award of "such relief (including injunctions) as may be appropriate." [17] Nothing in the legislative history

---

17. The Supreme Court recently decided that a district court's order invalidating an election and providing for a rerun under its supervision could not be "appropriate" relief for a Bill of Rights suit filed under section 102 during the course of a union election. *Local 82, Furniture & Piano Moving*, —— U.S. ——, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984). The Court found ample evidence in the legislative history that the provisions of LMRDA Title IV regulating the conduct of union elections were meant to be exclusive and that court supervision of elections as a remedy under section 102 for Title I violations was implicitly precluded. Although the deci-

either expressly precludes or expressly authorizes the award of punitive damages.[18] In *Hall v. Cole*, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973), the Supreme Court considered the scope of relief authorized by section 102 in deciding whether the award of attorneys' fees was proper under that section. The Court read section 102, in light of its legislative history, as affording "wide latitude to grant relief according to the necessities of the case." 412 U.S. at 13,[19] 93 S.Ct. at 1950. Because it found that an attorneys' fee award in the case before it was within the traditional equitable powers of the court under the "common benefit" theory, and that the availability of counsel fees was necessary to the civil enforcement of the Bill of Rights by individual union members, the Court concluded that such fees were available under the LMRDA, in appropriate cases. The Supreme Court in *Hall v. Cole* thus gave a broad reading to section 102. In the absence of explicit congressional intent either to preclude or to permit the award of counsel fees, the Court looked to the traditional powers of equity and the policies underlying the statute, and found both to favor the award of counsel fees in appropriate cases. One court has found the court's decision in *Hall v. Cole* to be, "at the least, not hostile to the award of punitive damages" under section 102. *See Morrissey v. National Maritime Union*, 544 F.2d at 25.

Whether section 102 can be read as permitting the award of punitive damages involves somewhat different considerations,

however, than were involved in *Hall v. Cole*. While the award of counsel fees falls squarely in the hands of the judge and is limited by objective measures, there is a danger that exhorbitant punitive damage awards by juries against unions and their officers would impair the ability of these institutions, which are often in chronically precarious financial health, to carry out their statutory duty to the workers they represent, most of whom are ordinarily innocent of any wrongdoing. Indeed, in the Supreme Court's later decision in *IBEW v. Foust*, 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979), the danger of permitting punitive damage awards against unions was an important consideration underlying the creation of a *per se* rule precluding punitive damages in DFR suits. *Id.* at 50–51, 99 S.Ct. at 2126–2127. The Court seemed particularly concerned about permitting such potentially burdensome awards in cases arising under a judicially-implied cause of action enforcing a judicially-implied duty. The Court thus expressly reserved the very different question of "[w]hether the explicit statutory language of 29 U.S.C. §§ 411 and 412 and the accompanying legislative history authorize punitive damage awards." *Id.* at 47 n. 9, 99 S.Ct. at 2125 n. 9. We are thus reminded that, in determining what forms of relief are available in a suit expressly authorized by Congress, we are of course attempting to ascertain congressional intent and should look first to the language and legislative history of the provision.[20]

sion makes it clear that section 102's authorization of "appropriate" relief is not an unlimited grant of remedial authority, the Court's decision has little bearing on the very different issue before us.

**18.** Two comments made about the nearly identical enforcement provision of the House committee bill, which was rejected on the floor of the House in favor of the eventually enacted Landrum-Griffin bill, indicated that courts could award "monetary damages if suffered." 105 Cong.Rec. 15689 (1959) (statement of Rep. O'Hara). *See also id.* at 15547–48 (statement of Rep. Elliott) (court could "award money damages to compensate any loss suffered by a member"). Although the Supreme Court has indicated that comments made about the committee

bill may be useful in construing section 102, *see infra* note 19, we decline to construe these isolated comments as decisive evidence of a congressional intent to preclude punitive damages, especially in light of the rejection of the committee bill in favor of what was generally agreed to be the tougher Landrum-Griffin bill.

**19.** The statement quoted by the Supreme Court was actually made by a supporter of the committee bill, which was rejected in favor of the Landrum-Griffin bill. 105 Cong.Rec. 15548 (1959) (statement of Rep. Elliott).

**20.** Two circuit courts that have revisited the question in light of *Foust* have reaffirmed their prior holdings permitting punitive damages. *See Parker v. Local 1466, United Steelworkers of*

As we have noted, the open-ended language used in section 102 is not greatly elucidated by the very limited congressional debate over the provision. However, the intent of Congress can also be discerned through an examination of the broader policies underlying the Bill of Rights provisions. The Supreme Court gave a broad reading to the language of section 102 in *Hall v. Cole;* in the absence of specific evidence of congressional intent with respect to the availability of counsel fees, the court gave content to the provision by examining policy considerations which it found to favor the award of such fees in some cases. We turn therefore to a consideration of the impact of punitive damage awards on unions and on the policies underlying the Bill of Rights provisions of the LMRDA. We are guided in our analysis by the Supreme Court's discussions of policy considerations in both *Hall v. Cole,* concerning counsel fees in suits under the same section, and *Foust,* concerning punitive damages in duty of fair representation suits.

In *Foust,* the Court laid heavy emphasis on the tension inherent in the duty of fair representation between the interests of the individual bargaining unit member and the interests of the unit as a whole in collective bargaining. The Court recognized that the availability of punitive damages for a breach of the duty of fair representation could tip the balance too far in the direction of the interests of the individual and thus hamper the union's ability to represent effectively the collective interests of the employees. 442 U.S. at 51–52, 99 S.Ct. at 2127–2128. Cases arising under the LMRDA, however, more typically involve a conflict between the individual union member and the incumbent union leadership, whose interests are not necessarily consonant with the interests of the membership as a whole. Thus, while conflicts may certainly arise between the individual rights of union members under the LMRDA and the interests of the membership as a whole, the potential for this kind of conflict does not

appear to us to be inherent in the very nature of the Bill of Rights provisions. Indeed, the basic harmony between these individual rights and the collective interests of the union membership underlies the Supreme Court's conclusion in *Hall v. Cole* that the award of counsel fees in the Bill of Rights case before it could be justified under the "common benefit" theory:

> When a union member is disciplined for the exercise of any of the rights protected by Title I [of the LMRDA], the rights of all members of the union are threatened. And, by vindicating his own right, the successful litigant dispels the "chill" cast upon the rights of others. Indeed, to the extent that such lawsuits contribute to the preservation of union democracy, they frequently prove beneficial "not only in the immediate impact of the results achieved but in their implications for the future conduct of the union's affairs."

412 U.S. at 8, 93 S.Ct. at 1948 (citation omitted). In view of the essentially convergent rather than competing nature of the individual rights protected by the LMRDA and the collective interests of the membership, there is less cause for the concern expressed in *Foust* that the availability of punitive damages in egregious cases would force unions to be overly solicitous of individual interests to the detriment of the membership as a whole.

However, the collective interests of the union membership, most of which is ordinarily innocent of wrongdoing, could be directly and severely harmed by the financial impact of a punitive damages award. The Supreme Court in *Foust* was thus also concerned that a punitive award that seriously unsettled a union's financial integrity, or even bankrupted the union, would severely prejudice the interests of the entire membership for the sake of a windfall recovery to the individual victim. 442 U.S. at 50–51, 99 S.Ct. at 2126–2127. Thus, while we perhaps need not worry that the

*America,* 642 F.2d 104, 107 (5th Cir.1981); *Bise v. IBEW,* 618 F.2d 1299, 1305 n. 6 (9th Cir.1979),

*cert. denied,* 449 U.S. 904, 101 S.Ct. 279, 66 L.Ed.2d 136 (1980).

future prospect of a punitive damage award will skew the union's efforts to strike a balance between competing individual and collective interests, we are concerned that the actual effect of a punitive damages award may be to cripple or destroy the union's ability to represent any of its members. Such a result would do little to further the congressional goal of fostering the development of vigorous and democratic labor organizations that are responsive to the needs of their members.

The Supreme Court in *Hall v. Cole*, 421 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702, considered a similar objection to the award of counsel fees in LMRDA suits:

> Petitioners contend that the payment of counsel fees out of the union treasury might deplete union funds to such an extent as to impair the union's ability to operate as an effective collective bargaining agent and to endanger union stability. Although this consideration is undoubtedly an important one, it is relevant, not to the *power* of federal courts to award counsel fees generally, but rather, to the exercise of the District Court's discretion on a case-by-case basis.

*Id.* at 9 n. 13, 93 S.Ct. at 1948. Based on the same reasoning, we think that the potential impact of a punitive damage award on the union's viability and effectiveness is a very important consideration, but one which does not justify a *per se* rule prohibiting punitive awards in all section 102 suits.

■ Because the award of punitive damages, unlike the award of counsel fees, will often rest with a jury, careful jury instructions may be necessary to ensure that adequate consideration will be given on a case-by-case basis to the financial impact of a punitive award on the union. Such punishment should be imposed only in the most egregious cases, in which the conduct of the union or its officers was malicious— motivated by ill will or a purpose to harm the plaintiff's interests.[21] Furthermore, the amount of any such award must not be so great as to cripple the union financially and detract significantly from its ability to represent its members.[22] The trial judge should be prepared to reduce any award that fails to reflect sufficient consideration of these factors.

■ In the case before us, the jury was properly instructed that it could award punitive damages only if it found that the defendants had acted with malicious intent.[23] Although the jury was not explicitly instructed to consider the impact of any punitive award against Local 31 on the union's ability to represent its members, the defendants did present to the jury evidence of the apparently abysmal financial condition of Local 31.[24] Indeed, this evi-

---

**21.** This standard is similar to that approved by the Eighth Circuit in *Vandeventer v. Local 513, Int'l Union of Operating Engineers*, 579 F.2d at 1379–80 & n. 8. It is somewhat stricter than that prevailing in other courts, which require only malice *or* reckless and wanton indifference toward the plaintiff's rights. *See Morrissey v. National Maritime Union*, 544 F.2d at 25; *Cooke v. Orange Belt Dist. Council of Painters*, 529 F.2d at 820; *International Bhd. of Boilermakers v. Braswell*, 388 F.2d at 200.

**22.** The factors that demand that special consideration be given to the impact of any punitive award on the union's ability to function effectively do not operate with equal force as to punitive awards against individual officers. Of course, the judge must always be prepared to adjust an award of punitive damages that is clearly excessive in light of all the circumstances, including the financial situation of the defendant. *See R.A. Weaver & Assoc. v. Haas & Haynie Corp.*, 663 F.2d 168, 174 (D.C.Cir.1980).

**23.** The trial judge instructed the jury to award punitive damages only if the actions of the defendants were "malicious and in willful, wanton, or reckless disregard of Mr. Quinn's rights." The jury was told it could find that defendants had acted maliciously if it was convinced that "the reason for their actions was a desire to harm Mr. Quinn." (Although part of the actual jury instructions, including that portion concerning punitive damages, is inexplicably missing from the record, we have confirmed through the court reporter's stenographic notes from the trial that the instructions on this point followed the Plaintiff's Requested Jury Instructions, which do appear in the record.)

**24.** According to counsel for the union in oral argument, Local 31 is judgment proof. As far

dence may account for the rather modest amount of the award, an amount that is not challenged in this court as excessive.[25] Under these circumstances, we uphold the award of $3000 in punitive damages against Local 31 for LMRDA violations.

### D. *Breach of Fiduciary Duty to Union Members*

We are presented with a series of challenges to the district court's determination that Baugh and DiGiulian breached their fiduciary duty to the members of Local 31 created by 29 U.S.C. § 501, which provides in relevant part: "The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group." The defendants argue first, as they did in support of their motion to dismiss, that Quinn did not fulfill what they contend are two strict prerequi-

sites to district court jurisdictions:[26] he did not make a formal demand on the union to bring suit on his behalf, and he did not obtain leave of the court, "upon verified application and for good cause shown," to proceed with his action before bringing his complaint. The defendants contend further that even if the court had jurisdiction over Quinn's section 501 action, Quinn did not state a cause of action under that section because the fiduciary obligation it creates concerns officers' dealings with the funds or property of the union and does not extend to the protection of members' individual political rights. The district court held, however, that under the particular circumstances, (1) Quinn's failure to make a formal demand that the union sue on his behalf was excused,[27] and (2) Quinn's inclusion in his verified complaint of a request for leave to proceed satisfied the requirement of section 501.[28] The district court

---

as we can tell from the record of post-trial proceedings in the district court, Local 31 has been unable to satisfy more than a fraction of the judgment against it.

**25.** In its post-trial motion for a judgment notwithstanding the verdict, the defendants did argue that the award was excessive in light of their "limited financial means"; they asserted that the union was in a "zero asset position." The court denied the motion and defendants did not appeal from that particular aspect of the court's decision.

**26.** These prerequisites are prescribed in the statute:

(b) When any officer, agent, shop steward, or representative of any labor organization is alleged to have violated the duties declared in subsection (a) of this section *and the labor organization or its governing board or officers refuse to fail to sue or recover damages or secure an accounting or other appropriate relief within a reasonable time after being requested to do so* by any member of the labor organization, such member may sue such officer, agent, shop steward, or representative in any district court of the United States or in any State court of competent jurisdiction to recover damages or secure an accounting or other appropriate relief for the benefit of the labor organization. *No such proceeding shall be brought except upon leave of the court obtained upon verified application and for good cause shown, which application may be made ex parte....*

29 U.S.C. § 501(b) (emphasis added).

**27.** The court held that Quinn was excused from the requirement that he request that the union sue on his behalf because, the court found (1) his suit was brought in good faith; (2) a demand on the union would have been futile; and (3) he had presented his complaint to the union president and requested that he take some action on Quinn's behalf. The court cited *Pawlak v. Greenawalt,* 464 F.Supp. 1265, 1269 (M.D.Pa. 1979); *Brink v. DaLesio,* 453 F.Supp. 272, 277 (D.Md.1978), *aff'd in pertinent part,* 667 F.2d 420 (4th Cir.1981); *Aho v. Bintz,* 290 F.Supp. 577, 580 (D.Minn.1968). *See also McNamara v. Johnston,* 522 F.2d 1157, 1162 (7th Cir.1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976) (failure to make demand on International excused where it would have been futile and when demand made on Local); *Sabolsky v. Budzanoski,* 457 F.2d 1245, 1252 (3d Cir.), *cert. denied,* 409 U.S. 853, 93 S.Ct. 65, 34 L.Ed.2d 96 (1972) (letter requesting internal relief sufficient under circumstances). *But see Cassidy v. Horan,* 405 F.2d 230, 233 (2d Cir. 1968) (strictly enforcing requirement of demand that union bring suit).

**28.** The district court held that "[i]n light of the highly specific, verified complaint, the request for leave to proceed found in ... the complaint, and the evidence of good cause clearly set forth in the other pleadings filed to date," Quinn had satisfied this requirement of § 501(b). *See, e.g., Sabolsky v. Budzanoski,* 457 F.2d at 1249; *Pawlak v. Greenawalt,* 464 F.Supp. at 1269. *But see Adams v. Rear,* 424 F.Supp. 1115 (W.D.Okl. 1976) (request for leave to proceed must be obtained *prior* to commencement of suit).

held finally that the fiduciary duty of section 501 extended to the protection of members' individual political rights, and that defendants had violated their duty.[29]

Each of these challenges would place us in a thicket of conflicting judicial interpretations of 29 U.S.C. § 501. We are particularly troubled by the district court's ruling on the scope of the fiduciary duty imposed by section 501.[30] However, we do not find it necessary to decide any of the questions presented. The single remedial order that the district court predicated on its finding of section 501 liability—the order that Baugh and DiGiulian refrain from violating or chilling the exercise of LMRDA rights of Local 31 members [31]—was a permissible form of relief against the same conduct found by the jury to violate section 102, 29 U.S.C. § 412. We thus affirm this order without deciding whether the district court's interpretation of both the jurisdictional and the substantive provisions of section 501 is correct.[32]

**29.** In its Judgment and Order of June 16, 1983, *supra* note 11, the court held that "the fiduciary obligations protected by § 501 ... include the requirement that union officials refrain from violating a union member's political rights." In so ruling, the court sided with those circuits taking a broad view of the scope of section 501. *See, e.g., Stelling v. IBEW,* 587 F.2d 1379, 1386–87 (9th Cir.1978), *cert. denied sub nom. Darby v. IBEW,* 442 U.S. 944, 99 S.Ct. 2890, 61 L.Ed.2d 315 (1979) (§ 501 breached by failure to submit bargaining agreement to vote as required by union constitution); *Sabolsky v. Budzanoski,* 457 F.2d 1245, 1249–50 (3d Cir.), *cert. denied,* 409 U.S. 853, 93 S.Ct. 65, 34 L.Ed.2d 96 (1972) (§ 501 breached by maintenance of "ghost locals" of less than 10 working members in violation of union constitution); *Johnson v. Nelson,* 325 F.2d 646, 649–51 (8th Cir.1963) (§ 501 breached by refusal to pay counsel fees incurred by member in successful § 102 suit). *But see Lux v. Blackman,* 546 F.2d 713, 717–18 (7th Cir.1976) (§ 501 has no application to claim that full and fair hearing denied); *Gurton v. Arons,* 339 F.2d 371, 375 (2d Cir.1964) (§ 501 applies only to handling of union funds and property); *cf. Shimman v. Frank,* 625 F.2d 80, 99 n. 38 (6th Cir.1980) ("serious doubt" that § 501 requires correction of "anti-dissident abuses," citing *Lux, supra*).

This court has three times refused to adopt either view. *See American Postal Workers Local 6885 v. American Postal Workers,* 665 F.2d 1096, 1108 (D.C.Cir.1981) (even under broader view, § 501 has no application to union's performance in collective bargaining); *Yablonski v. UMW,* 466 F.2d 424, 428 n. 5 (D.C.Cir.1972), *cert. denied,* 412 U.S. 918, 93 S.Ct. 2729, 37 L.Ed.2d 144 (1973). In *Cefalo v. Moffett,* 449 F.2d 1193, 1198 & n. 15 (D.C.Cir.1971), we indicated that *Bakery & Confectionery Workers Int'l Union v. Ratner,* 335 F.2d 691 (D.C.Cir.1964), approved the award of counsel fees in a section 501 suit not involving union funds or property, and thus implicitly approved the broader view. However, the underlying litigation in *Bakery & Confectionery Workers,* as described by this court, concerned misappropriation of union funds and "other acts of financial corruption." *Id.* at 692.

**30.** We are not necessarily convinced that even a broad view of the scope of section 501's fiduciary duty would necessarily encompass the duty to protect individual political rights under the LMRDA. The inclusion of such a duty would seem to stretch even such a broad formulation of section 501 as that of the Eighth Circuit in *Johnson v. Nelson,* 325 F.2d at 649: "Officers and other union representatives may not act adversely to their organization or to the members *as a group,* or acquire a personal interest which is contrary to the interests *of the organization*" (emphasis added). We would hesitate to adopt a construction of section 501 that would bring under the scrutiny of the federal courts virtually every aspect of the union's internal affairs, however remote from the handling of funds and property, conflicts of interest, and other issues traditionally subject to fiduciary principles. Furthermore, the district court's construction of section 501 to encompass protection of members' section 101 rights results, as far as we can tell, in protection duplicative of that afforded by section 101 itself. Nothing in the language, legislative history or purpose of section 501 seems to us to require such redundancy.

**31.** Although the district court's other injunctive orders, *supra* p. 641, are not expressly based on any particular section, it is apparent that they do not rest on section 501. The orders ran not only against Baugh and DiGiulian, who are subject to section 501's fiduciary duty, but also against Local 31 itself, which is not subject to that duty but is rather a beneficiary of its officers' fiduciary duty. We assume, therefore, that those orders were based on section 102, which authorizes "such relief (including injunctions) as may be appropriate," 29 U.S.C. § 412, against unions and officers.

**32.** *Cf. Shimman v. Frank,* 625 F.2d 80, 86 n. 10, 101 (6th Cir.1980) (where punitive damages awarded on claims based on same conduct under both LMRDA and Ohio tort law, and punitive damages are clearly authorized under the latter, court need not decide whether they are authorized under LMRDA).

### III. CONCLUSION

We affirm the judgment of the district court except insofar as it approved the award of punitive damages against Local 31 for its breach of the duty of fair representation.

*So Ordered.*